Mark Brnovich
Attorney General
Firm Bar No. 14000

Kara M. Karlson (029407)
Joseph E. La Rue (031348)
   *Assistant Attorneys General*
Office of the Attorney General
2005 N. Central Ave.
Phoenix, AZ  85007
Telephone (602) 542-5025
Facsimile (602) 542-4385
kara.karlson@azag.gov
joseph.larue@azag.gov
AdminLaw@azag.gov

Attorneys for Defendant
Katie Hobbs, Arizona Secretary of State

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Roque "Rocky" De La Fuente,<br><br>        Plaintiff,<br><br>vs.<br><br>Katie Hobbs, in her official capacity as the Secretary of State of Arizona,<br><br>        Defendant. | Case No: 2:16-cv-02419-JZB<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

**INTRODUCTION**

De La Fuente moves for summary judgment on two of his three claims: count I, which challenges the signature requirements in A.R.S. § 16-341(E) for independent candidates; and count III, which challenges the signature-distribution requirements in § 16-801(A) for new parties seeking ballot access. Doc. 58 at 2, 10. Yet he all but admits that he is not entitled to judgment as a matter of law on either one. He repeatedly argues that the evidence "is clearly sufficient for a reasonable jury" to find that the signature requirements in § 16-341 are too high, Doc. 58 at 19–20, 21–22, and then ventures beyond the record to argue why, as a factual matter, different signature-distribution requirements in § 16-801 would benefit new parties seeking ballot access.

He is wrong, and his arguments underscore why his motion should be denied: none of his claims can be resolved in his favor as a matter of law. De La Fuente cannot show that Arizona's ballot-access requirements for independent candidates impose a severe burden *in general* because—contrary to his claims—they are well within the national mainstream, and Arizonans consistently have had similar choices as voters across the country. De La Fuente also cannot show § 16-341 placed a severe burden *on him*. And whatever minimal burdens it imposes are easily justified by the State's important regulatory interests. As for the signature-distribution requirements in § 16-801, De La Fuente's claim fails for all the reasons stated in the Secretary's motion for summary judgment, (Doc. 55), and because De La Fuente introduces unresolved fact issues that preclude judgment for him.

**BACKGROUND**

The Secretary incorporates by reference the background facts in her motion, Doc. 55 at 3–4, but emphasizes or adds the following facts regarding De La Fuente's 2016 run for the presidency, and Arizona's signature requirements and electoral history.

***2016 Campaign.*** De La Fuente initially sought the Democratic nomination for the presidency in 2016. Doc. 56 ¶¶ 13–14, 20–22. When that did not work out, he "declared his independent candidacy at the close of the 2016 Democratic National

1 Convention." Doc. 58 at 9. In Arizona, he tried for one week to gather the necessary
2 35,514 valid signatures to qualify for the general election ballot as an independent
3 candidate for president. Doc. 56 ¶ 23. Rather than enlist the help of any volunteers, he
4 relied entirely on hired signature-gatherers, who collected between 4,000 and 9,000
5 signatures. *Id.* ¶¶ 24–25. He abandoned the weeklong signature-gathering effort after
6 one of his signature-gatherers reported only a 20 percent validity rate; based on that
7 figure De La Fuente estimated he would need to collect 150,000 signatures in order to
8 obtain the requisite 35,514 valid signatures. *Id.* ¶¶ 26–27, 29. De La Fuente eventually
9 qualified for the Arizona ballot as a write-in candidate representing the American Delta
10 Party, and received 29 votes. *Id.* ¶ 30.

11 De La Fuente asserts (without citation) that in the 2016 presidential election, he
12 "was successful in gaining direct access to 23 ballots as either an independent candidate
13 or as the nominee[] of the Reform Party or as the nominee for his own political party
14 labeled the American Delta Party" Doc. 58 at 9. But the Federal Election Commission
15 reports otherwise. According to the FEC's official summary of federal election results,
16 in 2016 De La Fuente appeared on only 8 States' general-election ballots as an
17 independent candidate, and on 11 States' ballots as a minor-party candidate.
18 Defendant's Additional Separate Statement of Facts (DSOF) ¶ 1. In Arizona, 30 other
19 States, and the District of Columbia, De La Fuente either qualified only as a write-in
20 candidate or did not appear on the ballot at all. DSOF ¶ 2.

21 Whether and how De La Fuente appeared on any given State's ballot seemingly
22 had little to do with its signature requirements for independent candidates. For example,
23 De La Fuente appeared on Nevada's ballot as an independent candidate, evidently
24 clearing that State's 5,431-signature threshold. DSOF ¶ 3.[1] But he failed to appear on

---

[1] For purposes of this discussion, the Secretary relies on the figures in the chart appended to De La Fuente's expert's report; although, as explained below, De La Fuente's expert's chart is misleading for many reasons.

2

1  Louisiana's ballot at all, even though that State requires independent candidates to
2  submit no signatures whatsoever.  DSOF ¶ 4.  De La Fuente also failed to appear on the
3  ballot (or qualified only as a write-in candidate) in Arkansas (which requires only 1,000
4  signatures for independent candidates), Maine (4,000 signatures), Nebraska (2,500),
5  South Dakota (2,775), and Washington State (1,000), among others.  DSOF ¶ 5.  Using
6  his own expert's figures, De La Fuente failed to appear on the ballot (or qualified only as
7  a write-in candidate) in 7 States with such a requirement at or below 5,000 signatures,
8  and 31 States with an independent-candidate signature requirement near or below 1
9  percent of the State's total voter registration.  DSOF ¶¶ 6–7.
10        Altogether, De La Fuente received only 33,136 votes nationwide, or 0.02 percent
11  of the presidential popular vote.  DSOF ¶ 8.  He won no electors.  DSOF ¶ 9.  Not
12  surprisingly, that lack of electoral support translated into a lack of financial support.  De
13  La Fuente raised a total of $8.076 million for his 2016 presidential campaign.  DSOF
14  ¶ 10.  But De La Fuente's loans to his campaign account for 99.8 percent of that sum; he
15  received only $17,125 in individual contributions.  *Id.*
16        ***Signature Requirements and Electoral History*.**  De La Fuente's challenge to
17  Arizona's signature requirements for independent candidates is premised on the idea that
18  Arizona is a national outlier in terms of those requirements or its electoral history.  *See*
19  Doc. 58 at 9, 12, 14, 18–19.  The facts tell a different story.
20        A.R.S. § 16-341 requires independent candidates for statewide office to obtain
21  signatures totaling at least 3 percent of the number of registered independent voters in
22  the State in order to appear on the general-election ballot.  A.R.S. § 16-341(E)–(F).  In
23  2016, this meant an independent presidential candidate in Arizona had to obtain 35,514
24  valid signatures.  Doc. 56 ¶ 4.  De La Fuente's expert, Richard Winger, claims this is
25  "the third most difficult independent presidential petition requirement of any state, when
26  the requirements are compared on a percentage basis," Doc. 60 ¶ 3, and De La Fuente
27  repeatedly cites that claim, *see* Doc. 58 at 9, 12, 19.  But as explained below, Winger's
28  claim is misleading and collapses under minimal scrutiny.  *See infra* Part II.A.2(c).

De La Fuente also points out that an independent candidate for president has not appeared on Arizona's general election ballot since 2008, when Ralph Nader did. Doc. 58 at 14.  But despite his claim that there have been "multiple dozens of declared independent presidential candidates" since 1992, *id.*, there is no record evidence about how many independent candidates have tried to gain ballot access in Arizona but failed.

Further, whether an independent candidate appeared on Arizona's general election ballot seemingly has had no correlation to the number of signatures required to do so.  Ralph Nader qualified for the ballot as an independent candidate in 2008, when approximately 21,758 signatures were required.  DSOF ¶¶ 11–12.  But no independent candidate appeared on Arizona's ballot in 2004, when roughly 15,899 signatures were required; or in 2000, when 8,900 were; or in 1996, when 9,433 were.  DSOF ¶¶ 13–18.

And contrary to De La Fuente's claim that "[i]n presidential elections, the voters of Arizona have lacked the political choices available to citizens in other states," Doc. 58 at 18, the number of independent candidates who have appeared on Arizona's general election ballot each year has been well within the national mainstream.  In 2016, Arizona was one of 35 States (including the District of Columbia) that had no independent candidates for president on its general election ballot; in 2012, it was one of 41 such States; in 2004, it was one of 29; in 2000, it was one of 32; and in 1996, it was one of 35. DSOF ¶¶ 19–20, 22–24.  In 2008, when Ralph Nader appeared as an independent candidate on Arizona's general election ballot, Arizona was one of 43 States to have one or zero independent candidates on its ballot.  DSOF ¶ 21.

More to the point, Arizona voters consistently have had choices besides the Republican and Democratic candidates for president.  In 2016 and 2012, Libertarian and Green party candidates for president appeared on the ballot in Arizona; in 2008, Libertarian, Green, and Independent candidates did; in 2004, a Libertarian did; and in 2000, the Green, Libertarian, Natural Law, and Reform parties all had candidates on the Arizona ballot; and in 1996, the Libertarian and Reform parties did.  DSOF ¶¶ 25–29.

4

**LEGAL STANDARDS**

Summary judgment must be denied unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**ARGUMENT**

**I.  De La Fuente Lacks Standing.**

As a threshold matter, De La Fuente should be denied summary judgment because he lacks standing to assert any of his claims. *See* Doc. 55 at 5–7.

**II.  De La Fuente Is Not Entitled to Summary Judgment on Any Claim.**

De La Fuente is not entitled to summary judgment anyway. States may require candidates to demonstrate support from "potential voters for the office," and require "a preliminary showing of substantial support in order to qualify for a place on the ballot." *Munro v. Socialist Workers Party*, 479 U.S. 189, 193–94 (1986) (internal quotation omitted). "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974).

Courts thus "weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" against the State's justification for the rule. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (internal quotation marks omitted). If a plaintiff's rights "are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). But when a state law imposes only "'reasonable, nondiscriminatory restrictions,'" then the "'State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). The same framework applies whether an election regulation is challenged in the context of a presidential

5

election or some other context. *Compare Nader v. Cronin*, 620 F.3d 1214, 1216–17 (9th Cir. 2010) (applying *Anderson/Burdick* to uphold Hawaii's ballot-access requirements for independent presidential candidates), *with Ariz. Green Party v. Reagan*, 838 F.3d 983, 988 (9th Cir. 2016) (applying *Anderson/Burdick* to uphold Arizona's filing deadline for new-party petitions in a challenge brought during the 2014 election cycle).

The Arizona ballot-access requirements that De La Fuente challenges are minimal restrictions, applied evenhandedly, and justified by the State's important regulatory interests. The Court should deny him summary judgment because his claims fail as a matter of law or at least cannot be resolved in his favor as a matter of law.

### A. De La Fuente Is Not Entitled to Summary Judgment on Count I

De La Fuente first seeks summary judgment on count I of his complaint, which challenges the requirement in A.R.S. § 16-341(E)–(F) that independent candidates obtain signatures totaling at least 3 percent of the number of registered independent voters in the State. Doc. 58 at 17.

#### 1. De La Fuente's challenge to § 16-341 fails as a matter of law

As explained in the Secretary's motion, De La Fuente's claim fails as a matter of law. Doc. 55 at 8–11. The Supreme Court repeatedly has upheld state laws requiring a candidate to demonstrate support of up to 5 percent of all *registered* voters, not just a subset of such voters (i.e., independents) as Arizona requires. *See, e.g.*, *Jenness v. Fortson*, 403 U.S. 431, 438 (1971) (upholding a Georgia law requiring minor-party candidates to obtain signatures from at least 5 percent of the number of registered voters at the last general election); *Storer*, 415 U.S. at 730 (upholding a California law requiring independent candidates to file nomination papers signed by at least 5 percent of the entire vote cast in the preceding general election within 24 days after the primary election); *Am. Party of Tex. v. White*, 415 U.S. 767, 788–89 (1974) (upholding Texas laws requiring independent candidates to obtain the signatures of 3 or 5 percent of voters in the last gubernatorial election). Arizona's 3-percent signature-gathering requirement is well within this constitutionally permissible range. And other "alleviating factors"

1 confirm that the requirement only minimally burdens candidates' rights. *Swanson v.*
2 *Worley*, 490 F.3d 894, 903–05 (11th Cir. 2007). For example, candidates can start
3 collecting signatures as early as they want, *see* A.R.S. § 16-322; any registered voter
4 may "sign the nomination petition without regard to the signer's party affiliation," *id.*
5 § 16-341(F); and there is no maximum number of signatures a candidate can submit to
6 try to satisfy the 3-percent requirement. Because the signature requirement in § 16-341
7 is objectively reasonable, De La Fuente's challenge fails as a matter of law.

**2. De La Fuente is not entitled to judgment as a matter of law**

9 Furthermore, De La Fuente cannot show that his claim must be resolved *in his*
10 *favor* as a matter of law. He seems to agree. He does not contend that he is "entitled to
11 judgment as a matter of law" on count I, as Rule 56(a) requires. Instead, he argues that
12 "the record in this case is clearly sufficient *for a reasonable jury to determine* that the
13 signature requirement imposed on independent presidential candidates under A.R.S.
14 §16-341 imposes a severe restriction … sufficient for strict scrutiny analysis to be
15 applied"; that "[t]he evidence in this case is clearly sufficient *for a reasonable jury to*
16 *decide* that the higher signature requirement imposed under A.R.S. §16-341, is excessive
17 and … unconstitutional"; and that "it would *seem implausibl[e]* that *a jury could*
18 *reasonably determine* that the higher signature requirements imposed on independent
19 presidential candidates [are] narrowly drawn to advance the state's interest[s]." Doc. 58
20 at 19–20, 21–22 (emphases added). Even if De La Fuente were right about what a
21 reasonable jury could plausibly find, that would not entitle him to summary judgment on
22 his claim. *See* Fed. R. Civ. P. 56(a). He is wrong in any event.

23 **a.** First, the record does not establish that the signature requirement in § 16-341
24 imposes a severe burden on candidates' constitutional rights. On the contrary, the
25 evidence shows that whether an independent candidate for president appears on
26 Arizona's general election ballot has little to do with the number of signatures required
27 for ballot access. The first presidential election in which Arizona's current 3-percent
28 requirement was in effect was in 1996. *See* Doc. 60 ¶ 8 (citing Ariz. Laws 1993, Ch. 98,

7

1  § 24, eff. Jan. 1, 1994).  That year, approximately 9,433 signatures were required for an
2  independent presidential candidate to gain general-election ballot access, but none did.
3  DSOF ¶¶ 17–18.  So too in 2000, when roughly 8,900 signatures were required, and in
4  2004, when approximately 15,899 signatures were required.  DSOF ¶¶ 13–16.  But in
5  2008, when approximately 21,758 signatures were required, Ralph Nader qualified for
6  the ballot as an independent candidate.  DSOF ¶ 11–12.  That Nader gained ballot access
7  in 2008 even though the signature requirement was higher that year than in any of the
8  three previous election cycles suggests that Arizona's signature requirement does not
9  prevent a candidate who enjoys a modicum of support from achieving ballot access.

10  **b.** De La Fuente argues that Arizona's signature requirement must impose a
11  severe burden because "[i]n presidential elections, the voters of Arizona have lacked the
12  political choices available to citizens in other states."  Doc. 58 at 18.  That simply is not
13  true.  In the six presidential elections for which the 3-percent requirement for
14  independent candidates has been in effect, Arizona voters consistently have had choices
15  besides the major-party candidates for president.  In 2016 and 2012, Libertarian and
16  Green party candidates for president appeared on the ballot in Arizona; in 2008,
17  Libertarian, Green, and Independent candidates did; in 2004, a Libertarian did; in 2000,
18  the Green, Libertarian, Natural Law, and Reform parties all had candidates on the
19  Arizona ballot; and in 1996, the Libertarian and Reform parties did.  DSOF ¶¶ 25–29.
20  As De La Fuente's expert explained in his California litigation, the presence of these
21  minor-party candidates on the ballot helps explain the absence of independent
22  candidates.  *De La Fuente v. State*, 278 F. Supp. 3d 1146, 1154 (C.D. Cal. 2017)
23  (quoting Winger's deposition testimony that "[b]ecause California has these minor
24  parties [o]n the ballot, that kind of—there's almost nobody left to petition").  And to the
25  extent that De La Fuente "focus[es] solely on independent candidates—rather than
26  major-party, minor-party, and independent candidates—[that] is contrary to recent Ninth
27  Circuit authority, which provides that courts '"must examine the entire scheme
28  regulating ballot access."'"  *Id.* (quoting *Ariz. Libertarian Party v. Reagan*, 798 F.3d

8

723, 730 (9th Cir. 2015)).

Even focusing only on independent candidates, Arizona voters have had roughly the same choices as voters across the country. In 2016, Arizona was one of 35 States plus the District of Columbia that had no independent candidates for president on its general election ballot; in 2012, it was one of 4 such jurisdictions; in 2004, it was one of 29; in 2000, it was one of 32; and in 1996, it was one of 35. DSOF ¶¶ 19–20, 22–24. In 2008, when Ralph Nader appeared as an independent candidate on Arizona's general election ballot, Arizona was one of 43 States to have one or zero independent candidates on its ballot. DSOF ¶ 21. The number of independent candidates who have appeared on Arizona's ballot each year thus has been well within the national mainstream, which suggests that Arizona's ballot-access requirements do not impose an unreasonable burden on independent candidates.

**c.** De La Fuente argues otherwise, based primarily on his expert's claim that "Arizona has the third most difficult independent presidential petition requirement of any state, when the requirements are compared on a percentage basis." Doc. 60 ¶ 3; *see* Doc. 58 at 9, 12, 19. That claim is misleading for many reasons. First, the "percentage basis" Winger refers to is supposedly "the number of signatures required to get an independent presidential candidate in 2016 in each state, divided by the number of registered voters in each state as of the general election." Doc. 60 ¶ 3. But given the diversity of the States' approaches to calculating their signature requirements, *see id.*, App'x A, it is arbitrary and misleading to choose a uniform divisor (as Winger did).

California's example illustrates the point clearly. Under California law, an independent candidate's nomination petition "shall be signed by voters of the state equal to not less in number than 1 percent of the entire number of registered voters of the state at the time of the close of registration prior to the preceding general election." Cal. Elec. Code § 8400. For the 2016 election, independent candidates needed to submit a number of signatures equal to 1 percent of total voter registration as of October 2014, or 178,039 signatures. Doc. 60, App'x A. But Winger did not use the reference point in

1  California's statute (October 2014 voter registration) in calculating his percentage basis; 2 instead, he chose his own reference point (November 2016 voter registration).  *See id.* 3 On that basis, Winger claims that in 2016 California required the signatures of only 0.92 4 percent of voters despite the State's statutory 1-percent requirement, and that 5 California's percentage-basis requirement was lower than Arizona's.  *Id.*  Winger pulled 6 the same trick for Florida (which, like California, required a number of signatures equal 7 to 1 percent of that State's October 2014 registration) and Delaware (which required a 8 number of signatures totaling 1 percent of that State's December 2015 registration).  *Id.*

9       A second reason why Winger's comparison is misleading is that, as Winger 10 himself explains, "[i]f a state changed its law since the 2016 election, the new law is 11 incorporated [into his analysis] as though it had existed in 2016."  Doc. 60 ¶ 3.  That is 12 the case for North Carolina, Maryland, and Oklahoma, which lowered their signature 13 requirements in 2017.  *Id.*  In other words, although Winger's chart purports to show 14 "2016 Ballot Access for an Independent Candidate for President," *id.*, App'x A, for at 15 least three States it shows no such thing.  Rather, it shows what those States' ballot-16 access requirements *would have been* if different, later-enacted laws were in effect.  Had 17 Winger used the laws that were actually in effect in 2016, his chart would have shown 18 that Maryland required independent candidates to submit petitions "signed by not less 19 than 1% of the total number of registered voters who are eligible to vote for the office" 20 being sought, former Ann. Code Md. § 5-703; that Oklahoma required independent 21 candidates to submit petitions "signed by a number of registered voters … equal to at 22 least three percent (3%) of the total votes cast in the last General Election for President," 23 former Okla. Stat. tit. 26, § 10-101.1(A)(1) (2011); and that North Carolina required 24 independent candidates to collect the signatures of "qualified voters of the State equal in 25 number to two percent (2%) of the total number of voters who voted in the most recent 26 general election for Governor," former N.C. Gen. Stat. § 163-122(a)(1).  At best, Winger 27 presents a distorted snapshot of the States' ballot-access requirements in 2016, and so his 28 claim that "Arizona has the third most difficult independent presidential petition

requirement of any state" is unreliable. Doc. 60 ¶ 3.

**d.** That is true for another reason: comparing States' ballot-access requirements only "on a percentage basis," *id.*, provides an incomplete picture of the relative difficulty of satisfying those requirements, because it excludes other important features of the States' electoral systems. For example, under Winger's percentage-based approach, Texas requires candidates to collect about half as many signatures as Arizona and thus apparently has an easier-to-satisfy requirement. *See* Doc. 60, App'x A. But as Winger acknowledges, Texas "does not permit voters who participated in a primary [to] sign" independent candidates' petitions, *id.* ¶ 4. In fact, Texas law provides that a petition is invalid if a signer signs it before the date of the presidential primary, and requires petitions to be filed in May of the presidential year, Tex. Elec. Code Ann. § 192.032(c), (g)(1)–(2). The combined effect of these laws in 2016 was that an independent candidate in Texas had only about two months to gather all the necessary signatures.

Other ballot-access requirements similarly contribute to independent candidates' relative burdens. Like Texas, North Dakota, South Dakota, and Virginia all limit when independent candidates can begin collecting signatures. N.D. Cent. Code § 16.1-12-02.3; S.D. Codified Laws § 12-7-1.1; Va. Code Ann. § 24.2-543(A). Texas, California, South Dakota, and West Virginia all forbid defeated partisan candidates from seeking ballot-access as an independent candidate. Tex. Elec. Code Ann. § 192.032(h); Cal. Elec. Code § 8301; S.D. Codified Laws § 12-7-5; W. Va. Code § 3-5-23(g). Virginia and New Jersey both forbid out-of-state petition circulators. N.J. Stat. Ann. 19:13-7; Va. Code Ann. § 24.2-543(A). Ohio limits the number of signatures a candidate can collect—a petition must have at least 5,000 valid signatures, but will not be accepted for filing if it has more than 15,000 signatures. Ohio Rev. Code Ann. § 3513.257(A).

These are just a few of the quirks of States' ballot-access requirements; Winger's percentage-based approach accounts for none of them. And remarkably, Winger claims that each of these States has an easier petition requirement than Arizona, even though Arizona: imposes no start date on signature gathering; allows all registered voters to

11

1 sign an independent candidate's petition, *see* A.R.S. § 16-341(F)–(G); allows out-of-
2 State petition circulators; and imposes no maximum number of signatures.

3 Winger's conclusion not only defies common sense, it also violates the Ninth
4 Circuit's admonition that "in determining the nature and magnitude of the burden that
5 [a] state's election procedures impose," courts "must examine the entire scheme
6 regulating ballot access." *Ariz. Libertarian Party*, 798 F.3d at 730 (quoting *Cronin*, 620
7 F.3d at 1217). By focusing single-mindedly on the number or percentage of voters'
8 signatures that States require—to the exclusion of all other features of their electoral
9 systems—Winger does not even begin to capture the real nature or magnitude of the
10 burdens he purports to compare. De La Fuente cannot possibly show that Arizona's
11 ballot-access requirements are objectively unreasonable or outside the mainstream.

12 **e.** De La Fuente also fails to show that § 16-341 imposed a severe burden *on him*.
13 He claims that he "failed to gain access in [Arizona] solely because" of the signature-
14 gathering requirement, and that he "was 'reasonably diligent' in his 2016 efforts to
15 secure access to Arizona's general election ballot." Doc. 58 at 9, 19. This is sheer
16 fantasy. As the Secretary explained in her motion, Doc. 55 at 9–10, nothing about De La
17 Fuente's ballot-access efforts in Arizona was reasonable. He spent *one week* trying to
18 collect signatures, mere weeks before the deadline, and relying entirely on paid
19 signature-gatherers. Doc. 56 ¶¶ 23–24. They gathered between 4,000 and 9,000 gross
20 signatures, but then he abandoned the effort because one of his hired hands reported only
21 a 20 percent validity rate, and De La Fuente concluded he needed to collect 150,000
22 signatures to obtain 35,514 valid ones. *Id.* ¶¶ 25, 26–27, 29. That conclusion was
23 unreasonable, but even if he had to collect as many signatures as he believed, "[t]he
24 Supreme Court has viewed substantially more arduous signature-gathering requirements
25 as within the realm of reason for someone who hopes to ascend to the Presidency." *De*
26 *La Fuente*, 278 F. Supp. 3d at 1155 (citing *Storer*, 415 U.S. at 740, noting that
27 "gathering 325,000 signatures in 24 days would not appear to be an impossible burden"
28 or "an impractical undertaking for one who desires to be a candidate for President.").

1 De La Fuente's record in other States with lower signature requirements belies his
2 claim that Arizona's signature requirement alone kept him off the ballot here as an
3 independent candidate. As noted, he failed to appear on Louisiana's ballot at all, even
4 though that State requires independent candidates to submit no signatures whatsoever.
5 DSOF ¶ 4. He also failed to appear on the ballot (or qualified only as a write-in
6 candidate) in Arkansas (which requires 1,000 signatures for independents), Maine
7 (4,000), Nebraska (2,500), South Dakota (2,775), and Washington State (1,000), among
8 others. DSOF ¶ 5. All told, using Winger's (suspect) figures, De La Fuente failed to
9 appear on the ballot or qualified only as a write-in in 7 States with such a requirement at
10 or below 5,000 signatures, and 31 States with an independent-candidate signature
11 requirement near or below 1 percent of the State's total voter registration. DSOF ¶¶ 6–7.

12 **f.** Because De La Fuente cannot show that § 16-341 imposes a severe burden on
13 independent candidates generally or on him, "the State's important regulatory interests
14 are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434. And he
15 "concedes, as he must, that Arizona … has a recognized interest to avoid ballot clutter
16 which may result in voter confusion" and thus may require independent candidates to
17 collect signatures "to demonstrate … a 'modicum of support' in the community [and]
18 screen out frivolous candidates." Doc. 58 at 21. That should be the end of the inquiry.

19 De La Fuente nonetheless claims "the record is bursting at the seams" with
20 evidence that Arizona's signature requirements are "excessive to what is necessary to
21 protect the state's legitimate interests." *Id.* at 20–21. It is not. First he notes that in
22 2016, Arizona required roughly 22,000 signatures for new parties to gain ballot access.
23 *Id.* at 21. As the Secretary explained, this is an apples-to-oranges comparison; the
24 Supreme Court and other courts have long recognized that independent candidates and
25 new parties are differently situated and thus need not be treated alike. Doc. 55 at 12–13.

26 Next De La Fuente argues, based on Winger's expert report, "that ballot clutter
27 does not occur when a state sets its signature requirement for statewide candidates at the
28 5,000 threshold level." Doc. 58 at 22 (citing Doc. 59 ¶¶ 59, 60, 63). But that is not what

13

1 Winger says. What Winger says is that in "all the instances in U.S. history at which a state required more than 5,000 signatures for both the independent presidential candidate procedure, and the procedure for a new party," "such state never had more than six successful qualification attempts for president in any one election, counting both new party qualification instances combined with independent presidential candidate qualification instances." Doc. 60 ¶ 7. Winger does not opine that six candidates is the golden mean to avoid ballot clutter or voter confusion, or that 5,000 signatures is the exact threshold for guaranteeing a significant modicum of voter support—nor could he. And as for his historical examples, Winger says nothing about what other requirements those States imposed in conjunction with their signature requirements.

De La Fuente notes that two district courts have "adopted" Winger's views, but the electoral systems in those cases imposed far more onerous requirements on independent candidates than Arizona does. In *Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340 (N.D. Ga. 2016), Georgia not only required candidates to gather signatures totaling 1 percent of *all* registered voters, but "[t]he affiant must, *inter alia*, swear that each signature was signed within 180 days of the last day on which the petition may be filed," and "different sheets must be used by signers residing in different counties or municipalities." *Id.* at 1347 (citing O.C.G.A. § 21-2-170(d)). And unlike Arizona, no independent or minor-party presidential candidate had appeared on Georgia's ballot in 16 years. *Id.* at 1348. In light of these specific facts, the court enjoined Georgia's 1-percent requirement and in its place imposed a 7,500-signature requirement (higher than Winger's 5,000-signature mark). *Id.* at 1374.

The Michigan ballot-access requirements at issue in *Graveline v. Johnson*, 336 F. Supp. 3d 801 (E.D. Mich. 2018), similarly combined to place heavy burdens on independent candidates. Michigan required independent candidates to submit 30,000 valid signatures, but also: (1) forbade candidates from collecting more than 60,000 signatures to try to meet that threshold; (2) imposed a 180-day deadline for collecting the signatures; (3) required that they be submitted 110 days before the election; and

14

(4) required that a petition "be signed by at least 100 registered voters in each of at least half of Michigan's 14 congressional districts." *Id.* at 806 (citing Mich. Comp. Laws §§ 168.590c(2), 168.544f, 168.590b(3), (4)). "[N]o independent candidate for statewide office ha[d] ever satisfied [this] statutory scheme." *Id.* at 811. Considering "the combined effect of the statutory scheme," the court preliminary enjoined the challenged requirements as to the plaintiff (an attorney-general candidate) in that case alone and imposed a 5,000-signature requirement on him. *Id.* at 813.

As already explained, Arizona's ballot requirements for independent candidates as a whole are not nearly as burdensome as the requirements in *Green Party* or *Graveline*; and unlike Georgia and Michigan, Arizona has had numerous minor-party and independent candidates on its general election ballots. If anything, *Green Party* and *Graveline* only highlight how reasonable Arizona's requirements are, and neither case justifies imposing an arbitrary signature requirement on Arizona.

Nor do De La Fuente and Winger supply a reasoned basis for doing so. Winger fixates on a 5,000-signature requirement, but then suggests Arizona could "require[] at least 5,000 or 10,000 signatures," and then admits that adopting such a requirement would have no real impact on the number of independent presidential candidates on the ballot. Doc. 60 ¶¶ 6–7, 9. De La Fuente, meanwhile, touts Winger's 5,000-signature figure, but then urges the Court to "simply impose the 22,000 signature requirement that Arizona required for the formation of a new political party in 2016." Doc. 58 at 22, 23. This just underscores how arbitrary De La Fuente's and Winger's proffered numbers are.

**g.** Finally, De La Fuente argues that even if § 16-341 imposes a minimal burden, it is still unconstitutional because the State's interest in regulating presidential elections is less important than its interest in regulating other elections. Doc. 58 at 24–25. Not so: the Constitution assigns the States an important role with regard to such elections. U.S. Const. amend. XII; *id.*, art. II, § 1, cl. 3. Also, the Ninth Circuit analyzes ballot-access requirements using the same framework regardless what kind of election it is. *See Nader*, 620 F.3d at 1216–17; *Ariz. Green Party*, 838 F.3d at 988. If a state law imposes

15

"'reasonable, nondiscriminatory restrictions,'" then the "'State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788). As explained, Arizona's minimally burdensome signature requirements are readily justified by its important regulatory interests.

Moreover, while the election for President, as the United States' only elected official representing all fifty states, necessarily has an impact beyond the borders of any one state, it does not follow, as Plaintiff assumes, that the States have less power to regulate that race. Rather, the Supreme Court has approved signature requirements much more onerous than Arizona's as reasonable and appropriate for "one who desires to be a candidate for President." *Storer*, 415 U.S. at 740. Indeed, it would be bizarre to argue that an independent candidate for Arizona mine inspector, treasurer, or corporation commissioner could be required to collect 35,000 signatures to qualify for the ballot but that same requirement would be asking too much for a candidate for the highest office in the land. De La Fuente's position on the law would do just that.

### B. De La Fuente Is Not Entitled to Summary Judgment on Count II

De La Fuente is not entitled to judgment as a matter of law on his alternative challenge to Arizona's signature-distribution requirements for new party petitions. As explained in the Secretary's motion, De La Fuente's claim fails as a matter of law. Doc. 55 at 14–16. The Secretary incorporates by reference that analysis. Suffice it to say, unlike the statutes at issue in *Moore v. Ogilvie*, 394 U.S. 814 (1969), and its progeny, § 16-801(A) does not impose the kind of "rigid, arbitrary formula" that is inherently suspect, *id.* at 818; or overvalue or undervalue the votes of rural Arizonans to the detriment of voters from more populous counties; or require new parties to collect a fixed number or percentage of signatures from each county. Section 16-801(A) does not dilute anyone's vote or significantly burden candidates' rights; it seeks to ensure that less populous counties are not ignored but does not give them veto power as in *Moore* and similar cases. Nothing in De La Fuente's motion changes that analysis.

De La Fuente does, however, raise one or more unresolved fact issues that (if

relevant) preclude summary judgment in his favor. He claims that "[a] distribution requirement based on Congressional and/or legislative districts … [would] lessen[] the financial impact of having to disperse circulators to rural counties," Doc. 58 at 28, but there is no evidence to back up that claim. Nor does it make much sense. De La Fuente apparently concedes that such a requirement would be constitutional, but having to collect signatures in each of Arizona's 8 congressional or 30 legislative districts—some of which are entirely rural—presumably would be more costly for an independent candidate than complying with the modest distribution requirements in § 16-801(A). In any event, there is no evidence regarding the "heavy financial impact" that § 16-801(A) supposedly imposed on De La Fuente. Doc. 58 at 28.

## CONCLUSION

For the reasons stated above, this Court should deny De La Fuente's motion for summary judgment.

Respectfully submitted this 4th day of February, 2019.

                         Mark Brnovich
                         Attorney General

                           s/Joseph E. La Rue
                         Kara M. Karlson (029407)
                         Joseph E. La Rue (031348)
                           *Assistant Attorneys General*

                         Attorneys for Defendant Katie Hobbs,
                         Arizona Secretary of State

**CERTIFICATE OF SERVICE**

I certify that I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following, this 4th day of February, 2019:

    Paul A. Rossi, Esq.
    IMPG Advocates, Inc.
    316 Hill Street
    Mountville, PA 17554
    Phone: 717.961.8978
    Paul-Rossi@comcast.net

    Morgan J.C. Scudi
    Lucas I Mundell
    Scudi & Ayers, LLP
    5440 Morehouse Dr., Ste. 4400
    San Diego, CA  92121
    mscudi@scudilaw.com
    lmundell@scudilaw.com

*Attorneys for Plaintiff*

                                         s/ Maureen Riordan
                                         Maureen Riordan

PHX-7640460-v1