Mark Brnovich
Attorney General
Firm Bar No. 14000

Kara M. Karlson (029407)
Joseph E. La Rue (031348)
  *Assistant Attorneys General*
Office of the Attorney General
2005 N. Central Ave.
Phoenix, AZ  85007
Telephone (602) 542-5025
Facsimile (602) 542-4385
kara.karlson@azag.gov
joseph.larue@azag.gov
AdminLaw@azag.gov

Attorneys for Defendant
Katie Hobbs, Arizona Secretary of State

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Roque "Rocky" De La Fuente,<br><br>          Plaintiff,<br><br>vs.<br><br>Katie Hobbs, in her official capacity as the Secretary of State of Arizona,<br><br>          Defendant. | Case No: 2:16-cv-02419-JZB<br><br>**DEFENDANT'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF RICHARD WINGER** |

**INTRODUCTION**

The Secretary respectfully moves *in limine* to exclude the testimony of plaintiff Roque "Rocky" De La Fuente's expert witness, Richard Winger, in whole or part. The Secretary does not dispute that Winger is qualified to testify as an expert. Rather, she moves to exclude Winger's testimony because it is unreliable and unhelpful, or outside the bounds of expert testimony altogether.

Underlying Winger's expert testimony is his purported "comparison of the laws of all fifty states," compiled in an appendix attached to his report. Doc. 60 ¶ 3 & App'x A. Based on that analysis, Winger concludes that "Arizona has the third most difficult independent presidential petition requirement of any state, when the requirements are compared on a percentage basis." *Id.* ¶ 3. As explained below, Winger's comparative methodology is so flawed that all the conclusions flowing from it are unreliable and unhelpful. It should be excluded on that basis, and also because Winger's myopic, percentage-based approach violates the Ninth Circuit's rule that ballot-access systems must be examined holistically.

Winger also opines "that the Arizona legislature [n]ever intended to make independent candidate ballot access as difficult as it has become." *Id.* ¶ 8. It is well established that opinions about legislative intent fall outside the bounds of expert testimony. But that is especially true here, where Winger's opinions are based only on his own speculation about legislators' intentions and expectations more than 25 years ago.

**LEGAL STANDARDS**

Under Rule 702 of the Federal Rules of Evidence, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if four things are all true: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid.

1

702.  "[I]n respect to all [these] matters," Rule 702 "'establishes a standard of evidentiary reliability.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert v. Merrell Down Pharms., Inc.*, 509 U.S. 579, 590 (1993)).  And whenever expert testimony is offered, the trial judge must find that it is "properly grounded, well-reasoned and not speculative before it can be admitted." Fed. R. Evid. 702, adv. comm. notes (2000).  The proponent of such testimony bears the burden of proving its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n. 10.

## ARGUMENT

**I. Winger's Testimony Is Unreliable and Unhelpful, Because His Methodology Is Flawed.**

"Rule 702 embodies the twin concerns of reliability and helpfulness," and "[a] court may exclude testimony that falls short of achieving either end." *Stilwell v. Smith & Newphew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) (internal punctuation omitted). Winger's testimony falls far short at both ends.  He purports to offer "[a] comparison of the laws of all fifty states" that "shows that Arizona has the third most difficult independent presidential petition requirement of any state, when the requirements are compared on a percentage basis." Doc. 60 ¶ 3.  That testimony is misleading—and therefore unreliable and unhelpful—for at least three key reasons.

*First*, the "percentage basis" Winger refers to is supposedly "the number of signatures required to get an independent presidential candidate in 2016 in each state, divided by the number of registered voters in each state as of the general election." Doc. 60 ¶ 3.  But given the diversity of the States' approaches to calculating their signature requirements, *see id.*, App'x A, it is arbitrary and misleading to choose a uniform divisor, as Winger did.

California's example illustrates the point clearly.  Under California law, an independent candidate's nomination petition "shall be signed by voters of the state equal to not less than 1 percent of the entire number of registered voters at the time of the close of registration prior to the preceding general election." Cal. Elec. Code § 8400.  For the

2

1  2016 election, independent candidates needed to submit a number of signatures equal to
2  1 percent of total voter registration as of October 2014, or 178,039 signatures. Doc. 60,
3  App'x A. But Winger did not use the reference point in California's statute (October
4  2014 voter registration) in calculating his percentage basis; instead, he chose his own
5  reference point (November 2016 voter registration). *See id.* On that basis, Winger
6  claims that in 2016 California required the signatures of only 0.92 percent of voters de-
7  spite the State's statutory 1-percent requirement, and that California's percentage-basis
8  requirement was lower than Arizona's. *Id.* Winger pulled the same trick for Florida
9  (which, like California, required a number of signatures equal to 1 percent of that State's
10 October 2014 registration) and Delaware (which required a number of signatures total-
11 ing 1 percent of that State's December 2015 registration). *Id.*

12      ***Second***, as Winger himself explains, "[i]f a state changed its law since the 2016
13 election, the new law is incorporated [into his analysis] as though it had existed in
14 2016." Doc. 60 ¶ 3. That he did so further renders his testimony unreliable and unhelp-
15 ful. Although Winger's chart purports to show "2016 Ballot Access for an Independent
16 Candidate for President," *id.*, App'x A, for at least three States—North Carolina, Mary-
17 land, and Oklahoma, Doc. 60 ¶ 3— it shows no such thing. Rather, it shows what those
18 States' ballot-access requirements *would have been* if different, later-enacted laws were
19 in effect. Had Winger used the laws that were actually in effect in 2016, his chart would
20 have shown that Maryland required independent candidates to submit petitions "signed
21 by not less than 1% of the total number of registered voters who are eligible to vote for
22 the office" being sought, former Ann. Code Md. § 5-703; that Oklahoma required inde-
23 pendent candidates to submit petitions "signed by a number of registered voters … equal
24 to at least three percent (3%) of the total votes cast in the last General Election for Presi-
25 dent," former 26 Okla. Stat. 2011, § 10–101.1(A)(1)); and that North Carolina required
26 independent candidates to collect the signatures of "qualified voters of the State equal in
27 number to two percent (2%) of the total number of voters who voted in the most recent
28

3

1  general election for Governor," former N.C. Gen. Stat. Ann. § 163-122(a)(1).  At best,
2  Winger presents a distorted snapshot of the States' ballot-access requirements in 2016.

3  Moreover, Winger's claim that he incorporated changes in state laws into his
4  analysis is only partially true:  Winger apparently incorporated only changes in state law
5  that affected the numerical signature requirements for independent candidates.  He omit-
6  ted other changes in state law that affected ballot access for independent candidates, in-
7  cluding (1) a change in Utah law requiring independent candidates to have the following
8  message printed beneath their names on a ballot:  "This candidate is not affiliated with,
9  or does not qualify to be listed on the ballot as affiliated with a political party," Utah
10 Code § 20A-6-301(1)(d); (2) a change in West Virginia law to limit who can be an inde-
11 pendent candidate, W. Va. H.B. 4434, *amending* W. Va. Code § 3-5-23; and (3) a
12 change in North Carolina law changing the petition deadline for independent candidates
13 from June to May, 2017 North Carolina Laws S.L. 2017-214 (S.B. 656).  Winger report-
14 ed all three developments on the website he edits (*Ballot Access News*), *see*
15 https://bit.ly/2VyetVP (Utah); https://bit.ly/2LWCnG5 (West Virginia);
16 https://bit.ly/2FjZRnB (North Carolina), and all affect ballot access for independent can-
17 didates, but Winger omitted all three from his analysis.

18 ***Third***, and relatedly, comparing States' ballot-access requirements only "on a
19 percentage basis" (as Winger purports to do, *id.*) provides an incomplete picture of the
20 relative difficulty of satisfying those requirements, and violates the Ninth Circuit's re-
21 peated admonition that "in determining the nature and magnitude of the burden that [a]
22 state's election procedures impose," courts "must examine the entire scheme regulating
23 ballot access," , *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 730 (9th Cir. 2015)
24 (quoting *Nader v. Cronin*, 620 F.3d 1214, 1217 (9th Cir. 2010)).

25 For example, under Winger's percentage-based approach, Texas requires candi-
26 dates to collect about half as many signatures as Arizona and thus apparently has an eas-
27 ier-to-satisfy requirement.  *See* Doc. 60, App'x A.  But as Winger acknowledges, Texas
28 "does not permit voters who participated in a primary sign" independent candidates' pe-

4

1 titions, *id.* ¶ 4; in fact, Texas law provides that a petition is invalid if a signer signs it be-
2 fore the date of the presidential primary, and requires petitions to be filed in May of the
3 presidential year, Tex. Elec. Code § 192.032(c), (g)(1)–(2). The combined effect of
4 these laws in 2016 was that an independent candidate in Texas had only about two
5 months to gather all the necessary signatures.

6 Other ballot-access requirements similarly contribute to independent candidates'
7 relative burdens. North Dakota, South Dakota, and Virginia, like Texas, all limit when
8 independent candidates can begin collecting signatures. N.D. Century Code § 16.1-12-
9 02.3; S.D. Consol. L. § 12-7-1.1; Va. Code Ann. § 24.2-543(A). Texas, California,
10 South Dakota, and West Virginia all forbid defeated partisan candidates from seeking
11 ballot-access as an independent candidate. Tex. Elec. Code § 192-032(h); Cal. Elec.
12 Code § 8301; S.D. Consol. Laws § 12-7-5; W. Va. Code § 3-5-23(g). Virginia and New
13 Jersey both forbid out-of-state petition circulators. N.J. Stat. Ann. 19:13-7; Va. Code
14 Ann. § 24.2-543(A). Ohio limits the number of signatures a candidate can file—a peti-
15 tion must have at least 5,000 valid signatures, but will not be accepted for filing if it has
16 more than 15,000 signatures. Ohio Rev. Code Ann. § 3513.257(A).

17 These are just a few of the many different approaches to ballot-access adopted by
18 the States; Winger's percentage-based approach accounts for none of them. It is there-
19 fore unreliable and unhelpful in comparing them. And it cannot be reconciled with the
20 Ninth Circuit's repeated insistence that ballot-access laws be evaluated holistically. *See*
21 *Ariz. Libertarian Party*, 798 F.3d at 730 (requiring courts to "examine the entire scheme
22 regulating ballot access"); *In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104, 1108
23 (S.D. Cal. 2012) (excluding expert testimony where analysis was based on a "standard
24 that is incompatible with that set forth by the Ninth Circuit").

25 **II.  Winger's Testimony Regarding Legislative Intent Should Be Excluded.**

26 Winger also opines that he "do[es] not believe that the Arizona legislature ever
27 intended to make independent candidate ballot access as difficult as it has become."
28 Doc. 60 ¶ 8. The Court should exclude this opinion.

5

1  "Inferences about the intent or motive of parties or others lie outside the bounds
2  of expert testimony." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546
3  (S.D.N.Y. 2004); *accord Siring v. Ore. St. Bd. of Higher Educ. ex rel. E. Ore. Univ.*, 927
4  F. Supp. 2d 1069, 1077 (D. Or. 2013) (collecting cases); *Johnson v. Wyeth LLC*, No. CV
5  10-02690-PHXFJM, 2012 WL 1204081, at *3 (D. Ariz. Apr. 11, 2012) (excluding ex-
6  pert testimony "concerning defendants' motive, intent, knowledge, or other state of
7  mind"). That is because "intent, whether legislative or otherwise, [is] a conclusion that
8  is 'particularly within the province of the trier of fact.'" *N.C. St. Conf. of the NAACP v.*
9  *McCrory*, 182 F. Supp. 3d 320, 494–95 (M.D.N.C. 2016) (quoting *Allen Organ Co. v.*
10 *Kimball Int'l, Inc.*, 839 F.2d 1556, 1567 (Fed. Cir. 1988)) (excluding expert opinion on
11 legislative intent in enacting an election law), *rev'd on other grounds*, 831 F.3d 204 (4th
12 Cir. 2016).
13 Winger's testimony about what the Arizona legislature intended should be ex-
14 cluded first, because expert testimony about legislative intent is inappropriate in general;
15 and second, because Winger's testimony in particular is wholly speculative. Winger's
16 "belie[f] that the Arizona legislature [n]ever intended to make independent candidate
17 ballot access as difficult as it has become" apparently is based on the fact that increase in
18 the proportion of independent voters has outpaced population growth in Arizona in the
19 last 25 years, "and probably no one expected that in the 21st century, the proportion of
20 voters choosing to be registered independents would increase so dramatically." Doc. 60
21 ¶ 8. That sort of speculation about what anyone "probably … expected" cannot support
22 expert testimony, much less such testimony about legislative intent. *See* Fed. R. Evid.
23 702, adv. comm. notes (2002) (requiring that expert testimony be "properly grounded,
24 well-reasoned and not speculative before it can be admitted").

25                                    **CONCLUSION**

26 The Court should exclude all of Winger's expert testimony. Alternatively, the
27 Court should exclude, at minimum, Winger's testimony based on his percentage-based
28 methodology and testimony regarding legislative intent.

1     Respectfully submitted this 4th day of February, 2019.

                                        Mark Brnovich
                                        Attorney General

                                        s/Joseph E. La Rue
                                        Kara M. Karlson (029407)
                                        Joseph E. La Rue (031348)
                                          *Assistant Attorneys General*

                                        Attorneys for Defendant Katie Hobbs,
                                        Arizona Secretary of State

**CERTIFICATE OF SERVICE**

I certify that I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following, this 4th day of February, 2019:

Paul A. Rossi, Esq.
IMPG Advocates, Inc.
316 Hill Street
Mountville, PA 17554
Phone: 717.961.8978
Paul-Rossi@comcast.net

Morgan J.C. Scudi
Lucas I Mundell
Scudi & Ayers, LLP
5440 Morehouse Dr., Ste. 4400
San Diego, CA  92121
mscudi@scudilaw.com
lmundell@scudilaw.com

*Attorneys for Plaintiff*

                                                                                                         s/ Maureen Riordan

PHX - 7640861-v1