Paul A. Rossi, Esq.
IMPG Advocates, Inc.
*Counsel to Plaintiff*
316 Hill Street
Mountville, PA  17554
717.961.8978
Paul-Rossi@comcast.net

*Admission Pro Hac Vice*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ROQUE "ROCKY" DE LA FUENTE,<br><br>               Plaintiff,<br><br>vs.<br><br>MICHELE REAGAN, in her official capacity as the Secretary of State of Arizona,<br><br>               Defendants. | Case No.: 2:16-cv-02419-PHX-JZB<br><br><br>PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

## PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.P. 56 and L.R.Civ.P. 56 Plaintiff Roque "Rocky" De La Fuente submit the following response to Defendant's Motion for Summary Judgment.

## I.    SUMMARY OF RESPONSE

Defendant's motions for summary judgment must be denied.  Plaintiff has standing to maintain every claim in his Second Amended Complaint.  The record evidence is more than sufficient to allow a reasonable jury to find in favor of Plaintiff as to Counts I and II of Plaintiff's Second Amended Complaint and that the signature requirement imposed on independent presidential candidates by A.R.S. Section 16-341 is excessive and not narrowly tailored to advance the state's legitimate interests and that the greater number of signatures required to be

collected by independent presidential candidates by A.R.S. Section 16-341 that for a new political party to gain access to the general election ballot under A.R.S. §16-801 violates, as a matter of established law, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  With respect to Count II of Plaintiff's Second Amended Complaint, Defendant has acknowledged that in 2020 independent presidential candidates will be required to collect approximately 37,141 valid signatures to gain ballot access to Arizona's general election while new political parties will be require to collect only 31,603 signatures to secure ballot access for the 2020 primary and general elections.  *See* Defendant's Statement of Facts in Support of Motion for Summary Judgment at ¶¶6, 11. while lower signature requirements are permitted to be imposes on major party candidates to gain access to a State's primary election ballot than signature requirements imposed on minor party and independent candidates to gain general election ballot access, the analysis for the lower major party signature totals are tethered to the historical electoral success of the Republican and Democratic parties which does not apply vis-à-vis signature requirements imposed on new political parties versus independent candidates each of whom lack the prior electoral success of the major parties, and therefore, are indistinguishable as a class preventing disparate treatment for ballot access under the Equal Protection Clause.

Furthermore, Defendant's motion for summary judgment as to Count III of Plaintiff's Second Amended Complaint must be denied as county-based signature distribution requirements have been uniformly rejected as unconstitutional under both the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution.  Accordingly, the Court should deny Defendant's motion for summary judgment in its entirety.

## II.    STATUTORY BACKGROUND

Section 16-341 of the Arizona Revised States provides the signature requirements and deadlines imposed on independent presidential candidates to gain access to Arizona's general election presidential ballot:

> The nomination petition shall conform as nearly as possible to the provisions relating to nomination petitions of candidates to be voted for at primary elections and shall be signed by at least the number of persons who are registered to vote determined by calculating three percent of the persons who are registered to vote of the state, county, subdivision or district for which the candidate is nominated who are not members of a political party that is qualified to be represented by an official party ballot at the next ensuing primary election an accorded representation on the general election ballot.

Section 16-801 of the Arizona Revised Statutes provides for the number of signatures that new political parties must collect to gain access to Arizona's primary and general election ballots. Section 16-801 provides in relevant part that:

> A new political party may become eligible for recognition and shall be represented by an official party ballot at the next ensuing regular primary election and accorded a column on the official ballot at the succeeding general election on filing with the secretary of state a petition signed by a number of qualified electors equal to not less than one and one-third percent of the total votes cast for governor at the last preceding general election at which a governor was elected. From this number, at least five different counties shall be included as the county of registration among the required total of qualified electors and at least ten percent  of the total of qualified electors shall be registered in counties with populations of less than five hundred thousand persons.

## III.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff was an independent candidate for the Office of President of the United States in the 2016 general election.  Plaintiff declared his independent candidacy at the close of the 2016 Democratic National Convention.  In support of his independent candidacy, Plaintiff initiated a nationwide petition campaign to gain access to state general election ballots in the 2016 presidential election.  Plaintiff was successful in gaining direct access to 23 ballots as either an

independent candidate or as the nominees of the Reform Party or as the nominee for his own political party labeled the American Delta Party.

Plaintiff failed to gain access in certain states solely because of specific ballot access restrictions that could not be overcome in the short period of time between the close of the 2016 Democratic National Convention and the advent of various filing deadlines imposed by states, generally starting on August 1, 2016.  Arizona was one such state, in that, in 2016 A.R.S. §16-341required Plaintiff to collect and timely file, at great economic cost, a minimum of over 35,000 valid signatures of registered voters in Arizona, a signature requirement accounting for .99% of the entire number of registered voters in the State of Arizona – a percentage of voters which is currently the third highest signature collection requirement in the United States.

As history advances, and as a more mature factual record emerges as to the actual impact of excessive state-imposed signature gathering requirements have on the ability of independent and third-party presidential candidates to gain access to general election ballots, courts have begun to more faithfully apply the instructions of the United States Supreme Court in *Anderson v. Celbrezze* that the historical absence of independent candidates from a state's general election ballot is indicative of a constitutional infirmity directed at the First Amendment rights of candidates and voters to effectively participate in elections.  Courts have also begun to routinely recognize that state interests in regulating their ballots to avoid ballot clutter and voter confusion is at a minimum in presidential elections which implicate national interests that outweigh the more general state interests in purely state election contests.

Plaintiff filed this action to vindicate rights granted to him under the First and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. §1983 on July 20, 2016. Plaintiff filed an Amended Complaint on November 2, 2016 and a Second Amended Complaint

on October 17, 2017.  After discovery established by the Court, dispositive motions were order to be filed no later than November 29, 2018.

Section 16-341 of the Arizona Revised States provides the signature requirements and deadlines imposed on independent presidential candidates to gain access to Arizona's general election presidential ballot:

> The nomination petition shall conform as nearly as possible to the provisions relating to nomination petitions of candidates to be voted for at primary elections and shall be signed by at least the number of persons who are registered to vote determined by calculating three percent of the persons who are registered to vote of the state, county, subdivision or district for which the candidate is nominated who are not members of a political party that is qualified to be represented by an official party ballot at the next ensuing primary election an accorded representation on the general election ballot.

In the 2016 general election, an independent presidential candidate was required to collect and timely file a minimum of 35,514 valid signatures in order to gain access to Arizona general election presidential ballot.  Statement of Facts  ¶55.  Expert testimony of Richard Winger reports that: "Arizona has the third most difficult independent presidential petition requirement of any state, when the requirements are compared on a percentage basis."  Statement of Facts  ¶56.  Expert testimony of Richard Winger further explains that "in the entire history of the United States, only six independent presidential candidates have ever successfully completed petition requirement in excess of 5,000 signatures." (Ross Perot in 1992, John Anderson in 1980, Ralph Nader in 2004 and 2008, Eugene McCarthy in 1976, Lyndon LaRouche in 1984 and 1992 and Rocky De La Fuente in 2016).  Statement of Facts  ¶59.  Expert testimony of Richard Winger further establishes that history demonstrates that there is no evidence of ballot clutter when the signature requirement for a statewide ballot is established at the 5,000 signature requirement, with no such state experiencing any more than 6 candidates.  Statement of Facts  ¶¶

PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 5

60, 63.

In contrast to the signature requirements imposed on independent presidential candidates to gain access to Arizona's general election presidential ballot under Section 16-341 of the Arizona Revised Statutes, the formation of a new political party with automatic access to Arizona's primary and general election ballot only required 22,634 signatures in 2016. Statement of Facts ¶¶ 49-50.

Section 16-801 of the Arizona Revised Statutes provides for the number of signatures that new political parties must collect to gain access to Arizona's primary and general election ballots. Section 16-801 provides in relevant part that:

> A new political party may become eligible for recognition and shall be represented by an official party ballot at the next ensuing regular primary election and accorded a column on the official ballot at the succeeding general election on filing with the secretary of state a petition signed by a number of qualified electors equal to not less than one and one-third percent of the total votes cast for governor at the last preceding general election at which a governor was elected. From this number, at least five different counties shall be included as the county of registration among the required total of qualified electors and at least ten percent of the total of qualified electors shall be registered in counties with populations of less than five hundred thousand persons.

In 2016, Section 16-801 of the Arizona Revised Statutes required the collection of 20,860 signatures distributed in five different counties and with at least 10 percent of the signatures secured from voters registered in counties with populations of less than 500,000 persons. Defendant has acknowledged that in 2020 independent presidential candidates will be required to collect approximately 37,141 valid signatures to gain ballot access to Arizona's general election while new political parties will be require to collect only 31,603 signatures to secure ballot access for the 2020 primary and general elections. *See* Defendant's Statement of Facts in Support of Motion for Summary Judgment at ¶¶6, 11.

PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IV.   STANDARD OF REVIEW FOR SUMMARY JUDGMENT**

A court shall render summary judgment when no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) & (c); *see also Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993).  A party may oppose a motion for summary judgment by asserting "any of the kinds of evidentiary materials listed in Rule 56(c)," including declarations and affidavits.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  If, as to any given material fact, evidence produced by the moving party…conflicts with evidence produced by the nonmoving party…we must assume the truth of the evidence set forth by the nonmoving party with respect to that material fact."  *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013).

The moving party bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celetex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  The applicable substantive law identifies which facts are material.  *Id*. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under governing law.  *Id*.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Id*. at 249-50.

Moreover, a court ruling on a motion for summary judgment may not engage in "[c]redibility determinations" or "the weighing of evidence," as those are functions reserved for the jury. *Id.* at 255.

## V.   ARGUMENT

### A.   <u>Plaintiff Has Standing to Maintain All Claims</u>

As this Court is well aware Plaintiff has the burden of demonstrating his standing. *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1152 (9th Cir. 2000). "As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Baker v. Carr*, 369 U.S. 186, 204 (1962).

To satisfy Article III standing, Plaintiff must show (1) he has suffered an injury in fact to a legally protected interest that is (a) concrete and particularized and (b) actual or imminent (as opposed to conjectural or hypothetical); (2) the injury is fairly traceable to the challenged statute; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61(1992). Nonetheless, "the injury required for standing need not be actualized." *Davis v. Federal Election Commission*, 554 U.S. 724 (2008); *See also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (holding plaintiff need not "first expose himself to actual arrest or prosecution" in order to obtain relief). Rather, a plaintiff may bring suit based on a prospective injury provided that the threat of enforcement is sufficiently "real, immediate, and direct." *Davis*, 128 S.Ct. 2759, 2769 (2008); *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983); *Babbit v. Farm Workers*, 442 U.S. 289, 298 (1979) (a plaintiff may challenge the prospective operation of a statute that presents a realistic and impending threat

PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 8

of direct injury).  In *Daien v. Ysursa*, 771 F.Supp. 2d 1215, an Arizona resident who was a past supporter of independent presidential candidate Ralph Nader and who expressed an intention to gather nominating signatures to secure ballot access for a yet unknown, independent presidential candidate in the State of Idaho had standing to challenge Idaho's ban on out-of-state petition circulators because his past support of independent candidates and his close geographic location to Idaho made his intended future support of an independent  presidential candidate in Idaho more than a passing fancy and all the more plausible sufficient to grant him standing to challenge the Idaho residency requirement.  *Daien*, 711 F.Supp. 2d at 1220.  The Idaho district court found that the facts were sufficient to establish that Idaho's residency requirement for petition circulators had a direct impact on Daien's ability to exercise the full reach of rights guaranteed him under the First Amendment (explaining that "but for" the residency requirement, Daien could circulate a nominating petition in Idaho today and open the door to both a yet-undeclared candidate's campaign for president, as well as to political dialogue concerning the beliefs and strengths of his chosen candidate, regardless of whether that candidate in fact decides to declare a candidacy or ultimately pursues a campaign in Idaho)  *Daien*, 711 F.Supp. 2d at 1223-24.

       In the instant action, Plaintiff, in addition to having contracted with petition circulators to actually circulate election petitions in Arizona for his 2016 candidacy and forced to abandon his effort to gain ballot access in 2016 when it because obvious that Plaintiff could not satisfy the Arizona's challenged excessive signature requirement (even accounting for the incorrect information that only independents could sign Plaintiff's independent presidential election petition),  has actually announced that he is a candidate for the Office of President of the United States in the 2020 general election, and is directly threatened by the excessive signature gathering requirements, the equal protection violation resulting from the lesser signature

gathering requirement for a new political party than that imposed on independent candidates and the county-based signature distribution requirement imposed on the formation of a new political party.  Just as in 2016 when Plaintiff launch his first presidential general election campaign, Plaintiff is presented with several options to appear on the various general election ballots in the 50 states and the District of Columbia. Like Arizona, most states afford non-major political party nominees at least two options to garner votes in the general election.  Most states, like Arizona afford presidential candidates who are not nominee of one of the two major political parties the option to appear on their general election ballot as the nominee of a third or new political party or to appear on the ballot under the moniker as an independent candidate.  For instance, in 2016 Plaintiff appeared on the presidential general election ballot in Colorado, Montana, Wyoming, North Dakota, Minnesota, Wisconsin, Kentucky, New Jersey, Rhode Island and New Hampshire as the nominee of the American Delta Party, a new political party founded by Plaintiff while in Utah, New Mexico, Iowa, Tennessee and Vermont Plaintiff appear on the presidential general election ballot as an Independent candidate and in Nevada, Florida and Idaho as the nominee of the Reform Party.

Presidential candidates have the right under the First and Fourteenth Amendments to the United States Constitution to have whatever options afforded to them to gain ballot access on a state's general election ballot to have all those options fully compliant with rights guaranteed under the federal constitution, even though he or she will appear on the state's general election ballot under only one of the ballot access options afforded to them under the state's election code. A presidential candidate, at the outset of his or her campaign has standing to challenge any unconstitutional provisions in any ballot access provision afforded to the presidential candidate so that the presidential candidate can properly evaluate all options available to them, free from

PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 10

any constitutional infirmity so that they can make their decision as to which ballot access option they intend to employ free from any impairment to rights guaranteed to them under the federal constitution.

While Plaintiff would prefer to appear as an independent candidate for President of the United States on all 50 state ballots, the reality is that in some states the rules and/or procedures for the various avenues to gain ballot access varies widely in some states such that it is sometimes easier and/or a more efficient use of scares campaign resources (both in terms of finances and volunteer resources) to gain ballot access by forming a new political party rather than taking the route to ballot access as an independent candidate.  At the early stages of his 2020 campaign for president, Plaintiff must survey the ballot access provisions afforded to him in each state and determine which ballot access provision in each state is best suited to ensure the most efficient mechanism to guarantee that his name will appear on the state's 2020 presidential general election ballot.  As in 2016, it is likely that in 2020 Plaintiff will appear on some state presidential general election ballots as the nominee of his new political party, the American Delta Party and in other states as an Independent candidate.  Plaintiff has been candid with the Court has to his preference to appear on Arizona's 2020 presidential general election ballot is as an Independent candidate.  However, Plaintiff has been equally candid that if the unconstitutionally excessive signature requirement imposed by Arizona is not lowered either by this Court or by the state legislature, Plaintiff will opt to form the American Delta Party as a new political party in Arizona as his vehicle to appear on Arizona's 2020 general election ballot.  Accordingly, Plaintiff as an announced presidential candidate, has standing to challenge any constitutional infirmity in the ballot access provisions made available to him under Arizona law.  The fact that he will ultimately only need to comply with one of the ballot access provisions to

PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 11

gain ballot access in 2020 does not deprive him standing to challenge constitutional violations in both provisions so that he can make his Arizona ballot access decision based on fully constitutional provisions.

However, there is more than a mere patina of a mootness argument masquerading as a standing argument in order to avoid the major exception to the mootness doctrine of "capable of repetition yet evading review" which is uniformly applied to election law cases. *See Spencer v. Kemma*, 523 U.S. 1, 17 (1996); *Murphy v. Hunt*, 455 U.S. 478 (1982); *Meyer v. Grant*, 486 U.S. 414, 417 n.2 (1988). At bottom, Defendant makes the argument that because Plaintiff was not sure whether he would run as a Republican, Democrat, Independent or American Delta Party candidate in 2020 at his deposition that he lacks standing, an argument which ignores that Plaintiff filed this action during the 2016 campaign, had standing to raise the claims contained in the original complaint and need not run in 2020 to conclude this litigation because the case is not mooted out as a result of the passage of the 2016 election. The fact that Plaintiff has, since his April 4th deposition and prior to the filing of the Second Amended Complaint in this case, decided that he will seek to run as an independent candidate where possible and as the American Delta Party nominee in states where the new party route to ballot access was easier than satisfying the requirements to appear on a State's general election ballot as an independent negates the need to even resort to the "capable of repetition, yet evading review" exception to the mootness doctrine. *See* Declaration of Plaintiff Roque "Rocky" De La Fuente at ¶¶6, 7. Accordingly, at all times this case was never moot and Plaintiff retained standing to advance this litigation, even in the immediate aftermath of the conclusion of the 2016 general election. Furthermore, Plaintiff's decision to run as an independent candidate where possible and as the nominee of the American Delta Party in all other states to ensure that his name appears on all 50

PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 12

state ballots clearly established that Plaintiff has maintained standing to invoke the jurisdiction of this Court as to all of the claims in Plaintiff's Second Amended Complaint.

Accordingly, Plaintiff has standing to challenge Sections 16-341, 16-801 and 16-803 because the unconstitutional provisions and interactions of the challenged provisions impair Plaintiff's ability to now properly plan for his 2020 presidential campaign in Arizona free from unconstitutional impairments under the First and Fourteenth Amendments.  Lastly, it is obvious that Plaintiff's impairment are the direct result of the challenged unconstitutional provisions contained in the challenged provisions and the requested prospective equitable relief will, in fact, provide Plaintiff complete relief.

> **B.**     **Arizona's Signature Gathering Requirement For Independent Presidential Candidates is Unconstitutionally Excessive Under the Supreme Court's More Flexible Ballot Access Analysis Established in *Anderson v. Celebrezze***

The old bright line ballot access analysis under which signature gathering requirements were presumed to be constitutional up to an assumed 5% of registered voters or previous vote totals, and which Defendant largely bases Defendant's motion for summary judgment are no longer valid under the Supreme Court's more balanced and flexible analysis announced in *Anderson v. Celebrezze*, 460 U.S. 780 (1983).  In fact, under the *Anderson* analysis, the United States District Court for the Northern District of Georgia recently ruled Georgia's 50,000 signature requirement for third party presidential candidates unconstitutional – the very state that the 5% rule was upheld under the old pre-*Anderson* analysis.

First, *Anderson* expressly rejects the bright line test relied on by Defendant.  *Anderson*, 460 U.S. at 789.  Instead, the Court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.  It then must identify and evaluate the precise interests put forward by the

PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 13

State as justifications for the burden imposed by its rules.  In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.  Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.  *Anderson*, 460 U.S. at 789.  Furthermore, in the context of presidential elections, the United States Supreme Court has made it clear that the States retain a lower interest in preventing access to their ballot because the presidential election content will be decided outside the borders of any one state.  In *Anderson v. Celebrezze*, 460 U.S. 780 (1983) the United States Supreme Court explained that:

> [I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest.  For the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation.  Moreover, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States.  Thus, in a Presidential election, a State's enforcement of more stringent ballot access requirements…has an impact beyond its own borders.  Similarly, the State has a less important interest in regulating Presidential elections than state-wide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries….The pervasive national interest in the selection of candidates for national office, and this national interest is greater than any interest of an individual State.

*Anderson* at 794-95.  Other courts have followed the Supreme Court's instruction in *Anderson* explaining that: "a ballot access restriction for presidential elections 'requires a different balance' than a restriction for state elections."  *See e.g., Bergland v. Harris*, 767 F.2d 1551, 1554 (11th Cir. 1985).

      1.      Signature Collection Requirement Imposed on Independent Presidential Candidates Implicate a Severe Restraint on Core Political Speech and <u>Strict Scrutiny Analysis Must Be Applied</u>

The United States Supreme Court has clearly instructed that courts must "be vigilant . . . to guard against undue hindrances to political conversations and the exchange of ideas." *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182, 192 (1999).  In evaluating the constitutionality of restriction on ballot access, "the rigorousness of [the court's] inquiry . . . depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).  When constitutional rights "are subjected to 'severe' restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Id.* (internal quotation marks and citation omitted).  "But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions."  *Id.*

The crux of Plaintiff's argument is that the 35,000+ signature requirement imposed by A.R.S. §16-341 is excessive and unduly infringe upon the constitutional right of Plaintiff to participate in Arizona's presidential electoral process and the rights of voters to associate with Plaintiff for the advancement of their political beliefs and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.  In a state where the pool of independent and/or unaffiliated registered voters is greater than the voter registrations of either the Republican or Democratic parties, the challenged statutory scheme preventing any independent presidential candidate from being able to gain access to Arizona's general election presidential ballot since 2008, smacks of a severe restriction of the rights of independent and unaffiliated voters to cast their votes for presidential candidates who are not tethered to any one political party.  "Voters can assert their preferences only through candidates or parties or both." *Anderson*, 460 U.S. at 787.  In presidential elections, the voters of Arizona have lacked the

political choices available to citizens in other states. In this regard, the effect of A.R.S. §16-341 is far from theoretical – with one exception (Ralph Nader in 2008), the voters of Arizona have not had the opportunity to cast their ballots for an independent presidential candidate. Furthermore, the rights of voters outside of Arizona are also limited and impaired by A.R.S. §16-341. The burden imposed by the State of Arizona indirectly impact voters outside the state's boundaries as well. Voters in other states who cast their vote for Plaintiff, where his name was included on the ballot, did so in the hopes that he would win the right to govern. The far-reaching impact of A.R.S. §16-341, accordingly, implicates a severe extra-territorial impact on core political speech protected under the First and Fourteenth Amendments to the United States Constitution which can only be justified if the signature requirement narrowly advances a compelling governmental interest.

Plaintiff, following his announcement that he would continue his campaign as an independent presidential candidate following the conclusion of the Democratic National Convention was diligent to hire professional circulators in the State of Arizona to collect the required 35,514 valid signatures to secure access to Arizona's general election ballot. Plaintiff's Statement of Facts at ¶¶10, 55. Plaintiff collected over 9,000 valid signatures before it became apparent that there was not enough time to collect and timely file the number of valid signatures required under A.R.S. 6-341 before he decided to pull the plug on the effort. The record demonstrates that Plaintiff De La Fuente was "reasonably diligent" in his 2016 efforts to secure access to Arizona's general election ballot. In *Storer v. Brown*, the Supreme Court explained that the appropriate question to be asked when reviewing signature requirements attached to ballot access is "could a reasonably diligent independent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in

PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 16

getting on the ballot." *Storer v. Brown*, 415 U.S. 724, 742 (1974).  In Arizona, the answer is clear.  The challenged signature requirement only rarely permit an independent  presidential candidate to gain access to Arizona's general election ballot.  In *Storer*, the Supreme Court instructed that: "Past experience will be a helpful, if not always an unerring guide:  It will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not." *Storer*, 415 U.S. at 742.  Furthermore, the record shows that Arizona's signature requirement is the third highest in the nation in terms of the percentage of registered voters that are required to sign an independent presidential election petition in order to gain access to Arizona's general election ballot.  Plaintiff's Statement of Facts ¶56.

In consideration of the lack of independent presidential candidates appearing on Arizona's general election ballots, that Arizona requires the third highest signature collection requirement in terms of the percentage of registered voters that must sign an independent presidential candidate's election petition, and Plaintiff's diligent attempt to collect and the actual number of signatures actually collected in a short period of time, the record in this case is clearly sufficient for a reasonable jury to determine that the signature requirement imposed on independent presidential candidates under A.R.S. §16-341 imposes a severe restriction on core political speech protected under the First and Fourteenth Amendments to the United States Constitution sufficient for strict scrutiny analysis to be applied.

        2.       The Signature Collection Requirements of A.R.S. §16-341 Are Not <u>Narrowly Tailored to Advance a Compelling Governmental Interest</u>

            a.     Arizona has established that 22,000 signatures is sufficient to protects its interests against ballot clutter and potential voter <u>confusion</u>

Once this Court determines political speech has been burdened and that strict scrutiny must be applied; it is presumed that the law, or regulation, or policy is unconstitutional. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). The government then has the burden to prove that the challenged law is constitutional. *Federal Election Com'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 450-51 (2007). To withstand strict scrutiny, the government must prove that the law is necessary to achieve a compelling governmental interest. *Id*. If this is proved, the state must then demonstrate that the law is also narrowly tailored to achieve the asserted interest. *Id*.

In order to meet its burden of proof, the government "must do something more than merely posit the existence of the disease sought to be cured." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (citing *Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434, 1455 (1985)). In other words, the government must factually prove the existence of the evil and that the asserted interest is necessary and narrowly tailored to remedy that evil. Under the requirement that any policy must be narrowly tailored to advance the asserted compelling governmental interest, defendants cannot forego a policy which is clearly less burdensome on free speech and association rights in favor of the policy challenged in this action.

Defendant has provided no evidence that the 35,000 signature collection requirement is narrowly tailored to advance a compelling governmental interest. To the contrary, the record is bursting at the seams evincing that the 35,000 signatures required to be collected by independent presidential candidates in 2016 under A.R.S. §16-341 is excessive to what is necessary to protect the state's legitimate interests.

Plaintiff concedes, as he must, that Arizona, in state elections has a recognized interest to avoid ballot clutter which may result in voter confusion. In support of this interest, a state may reasonably require an independent presidential candidate to collect a certain number of valid

signatures to demonstrate that he/she has a "modicum of support" in the community to screen-out frivolous candidates and prevent ballot clutter.  However, signature requirements which exceed what is necessary to protect this interest are unconstitutional under strict scrutiny analysis.

In the instant case, the record establishes that, at great economic cost (hundreds of thousands of dollars), a substantial redesign of Arizona's electoral databases (the formation of new political parties requires a "substantial redesign of our statewide database to incorporate a new political party) and a "redesign of all of [Arizona's] forms….to accommodate this [new]party, the State of Arizona has conclusively established that it is comfortable in protecting its interests against ballot clutter and potential voter confusion at a signature threshold which is far less than the number of signatures the challenged statute requires of independent presidential candidates (35,000 vs. just 22,000 signatures for new political parties in 2016) – in an arena (presidential elections) where the State of Arizona has a reduced interest in regulating its ballot. Plaintiff's Statement of Facts at ¶¶52, 53, 54.  The evidence in this case is clearly sufficient for a reasonable jury to decide that the higher signature requirement imposed under A.R.S. §16-341, is excessive and beyond what the State of Arizona needs to police against ballot clutter and voter confusion, and therefore, unconstitutional.  On this basis alone, Defendant's motion for summary judgment as to Count I of Plaintiff's Second Amended Complaint must be rejected as a trier of fact/jury after conclusion of the trial could decide, on the facts of this case, to enter judgment for Plaintiff.  At minimum, Plaintiff is entitled to established a full trial record on this claim, preventing this court from granting Defendant's motion for summary judgment as to Count I.  In fact, all of the evidence, even when considered in a light most favorable to Defendant, militate in favor of granting Plaintiff's motion for summary judgment as to Count I. It would seem implausibly that a jury could reasonably determine that the higher signature requirements

imposed on independent presidential candidates is narrowly drawn to advance the state's interest in preventing ballot clutter and potential voter confusion when the State of Arizona permits new political parties to populate its ballot for 4 consecutive years at just 22,000 signatures as of 2016.

> b. The record establishes that 5,000 signatures is sufficient to narrowly protect Arizona's interest against ballot clutter and <u>potential voter confusion</u>

Defendant has failed to challenge the historical evidence provided by expert witness Richard Winger that ballot clutter does not occur when a state sets its signature requirement for statewide candidates at the 5,000 threshold level.  Plaintiff's Statement of Facts ¶¶59, 60, 63. Richard Winger's testimony has been adopted by at least two courts in enjoining excessive signature gathering requirements.  In *Green Party of Georgia v. Kemp*, 171 F.Supp. 3d 1340 (N.D. Ga. 2016), Judge Richard Story enjoined Georgia's 50,000 signature requirement for independent and third-party presidential candidates because of the state's diminished interest in regulating the presidential ballot, and the fact that no independent or third party presidential candidate has qualified since Ross Perot in 1992 and, based on Richard Winger's testimony, set the new signature threshold for ballot access for independent candidates at 7,500 because the court was "confident that this requirement will prevent a crowded ballot."  *Green Party of Georgia* 171 F.Supp. 3d at 1373.  Judge Story further explained that in setting the 7,500 signature collection threshold for ballot access:

> "This does not imply that a signature requirement of 5,000 or less would lead to a crowded ballot: the Court simply cannot make this conclusion on the record presently before it…."The Court is sensitive to the State's interests here. Comparing the requirements of other states, 7,500 signatures places Georgia in the most restrictive third of states.  This is, 66% of states require fewer than 7,500 signatures, while 33% require more."

*Id.* In *Graveline v. Johnson*, Case No. 12354 (E.D. Mich. August 27, 2018) the district court preliminarily enjoined Michigan's ballot access requirement that independent candidates collect 30,000 signatures as probably unconstitutional in combination with other restrictions. Applying the *Anderson-Burdock* framework, the court found Michigan's restrictions severely impaired protected speech and applied strict scrutiny. Slip Op. at 8-16. The court found the "combined effect" of Michigan's regulations unconstitutional burdened speech. Slip Op. at 12-14. The court relied on *Storer* and the Ninth Circuit's decision in *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008) that historical exclusion of independent candidates is instructive of the "real impact" of ballot restrictions. Slip Op. at 12-14,16. The Michigan court accepted Richard Winger's testimony, noting its acceptance in 10 states and adopted Winger's 5,000 signature requirement as more narrowly advancing Michigan's legitimate interests. Slip Op. at 10,23-25.

Defendant has failed to offer any record evidence that a signature threshold greater than 5,000 signatures is necessary to protect Arizona's presidential ballot against clutter or potential voter confusion. Certainly, a signature gathering requirement less than 35,000 but greater than 5,000 will clearly more narrowly satiate the state's interest more narrowly then the challenged formula set forth in A.R.S. 16-341. In a pinch, the Court can simply impose the 22,000 signature requirement that Arizona required for the formation of a new political party in 2016 (or more precisely, adopt the same formula contained in A.R.S. 16-341 to determine the number of signatures that Arizona may require for independent candidates to gain access to the general election ballot).

        3.    Even Under a More Deferential Standard of Review, the Petition Requirement of A.R.S. §16-341 is Unconstitutional

Even if a court finds that a plaintiff's rights are not subject to "severe" restrictions, and therefore that strict scrutiny should not apply, a court must still "determine the legitimacy and strength of [the State's] interests [and] consider the extent to which those standards make it necessary to burden the [candidate's] rights. *Timmons v. Twin Cities New Area Party*, 520 U.S. 351, 358 (1997). "A court must then weigh all those factors to determine if the statute is constitutional." *Id*. Where a state ballot access provision imposes "lesser burdens," "a State's 'important regulatory interests' will usually be enough to 'justify reasonable, nondiscriminatory restrictions'" *Id*. at 358. As explained by Judge Story in *Green Party of Georgia*:

> "the State's regulatory interests is not sufficiently important to justify the restrictions on the First and Fourteenth Amendment rights of Plaintiff, the voters in Georgia, and the voters in other states. Defendant's interest is outweighed by a national interest. As the Eleventh Circuit stated in its decision remanding this case to this Court, 'a state's interest in regulating a presidential election is less important than its interest in regulating other elections because the outcome of a presidential election 'will be largely determined by voters beyond the State's boundaries' and 'the pervasive national interest in the selection of candidates for national office…is greater than any interest of an individual state.'"

*Green Party of Georgia*, 171 F.Supp. 3d at 1366-67 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 795(1983); and *Green Party of Georgia v. Georgia*, 551 Fed. Appx 982, 984 (11th Cir. 2014)). The Eleventh Circuit further explained "a ballot access restriction for presidential elections 'requires a different balance' than a restriction for state elections." *Id*. quoting *Bergland v. Harris*, 767 F.2d 1551, 1554 (11th Cir. 1985); *see also*, *Stein v. Alabama Secretary of State*, 774 F.3d 689, 691 (11th Cir. 2015) (explaining that the state has a "less important" interest in regulating presidential elections). The Sixth Circuit has also recognized that national interest of a presidential election lessens a state's interest in regulating the presidential ballot and skewing the balancing test away from a state as compared to a regulation of a purely state

PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 22

election.   In *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579 (6th Cir. 2006) the court explained that:

> It is important to note that the state's interests in regulating an election cannot trump the national interest in having presidential candidates appear on the ballot in each state.   In the context of the presidential election, "state-imposed restrictions implicate a uniquely important national interest."   *Anderson*, 460 U.S. at 794-95.   Strict ballot access requirements imposed by states have an impact beyond their own borders, placing some limits on a state's prerogative to regulate its elections.   Moreover, as opposed to state or local elections, the outcome of a presidential election largely will be determined by voters outside a state's borders, reducing the importance of the state's administrative concerns.

*Id*. at 594.   In this case as in *Green Party of Georgia* and *Libertarian Party of Ohio*, the operation of A.R.S. 16-341 "does more than burden the associational rights of …voters and candidates, it places a significant state-imposed restriction on a nationwide electoral process." *Id.* (quoting *Anderson*, 460 U.S. at 795.

Accordingly, for all the forgoing reasons, Defendant's motion for summary judgment as to Court I of Plaintiff's Second Amended Complaint should be denied and Plaintiff's motion for summary judgment as to Count I of Plaintiff's Second Amended Complaint should be granted under either strict scrutiny analysis or the more deferential balancing test standard announced in *Anderson*.

C.      **Arizona's Imposition of Larger Signature Requirement on Independent Presidential Candidates than for the Formation of a New Political Party Violates the Equal Protection Clause of the Fourteenth Amendment**

Even more clear, the fact that A.R.S.  Section 16-341 imposes a formula that in 2016 required independent presidential candidates to collect and timely file over 13,000 more valid signature than the number of signatures that A.R.S. Section 16-801 imposed on new political parties to collect and timely file is a clear violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution requiring relief if the two respective

formulas impose the collection of a different number of valid signatures after the 2018 gubernatorial election.

Discovery in this case was closed prior to Arizona's 2018 gubernatorial election and dispositive motions were due to be filed at the end of November 2018.  Because there was no record testimony as to the impact of the 2018 gubernatorial election, the vote totals of which determine how many signatures that a new political party must collect to be recognized in time for the 2020 election cycle, Plaintiff, at the time motions for summary judgment were required to be filed Plaintiff did does believe that any motion for summary judgment can be granted as to Count II of Plaintiff's Second Amended Complaint because at that time a material issue of fact was unresolved in the record to support a motion for summary judgment as to Count II. However, Defendant has now acknowledged that in 2020 independent presidential candidates will be required to collect approximately 37,141 valid signatures to gain ballot access to Arizona's general election while new political parties will be require to collect only 31,603 signatures to secure ballot access for the 2020 primary and general elections.  *See* Defendant's Statement of Facts in Support of Motion for Summary Judgment at ¶¶6, 11.  Accordingly, Defendant's motion for summary judgment as to Count II must be denied and the Court, *sua sponte* should grant summary judgment in favor of Plaintiff, or provide some avenue to allow Plaintiff to submit a motion for summary judgment as to Count II owing to the new evidence as to the impact of the 2018 gubernatorial election on the signature requirement for new political parties in 2020 and the continued disparity of treatment between new political parties and independent presidential candidates in 2020.

In *Danciu v. Glisson*, 302 So.2d 131 (1974), the Supreme Court of Florida addressed a requirement in the Florida Election Code whereby an independent candidate was required to

PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 24

collect signatures on petitions equal to 5% of the total registered electors within the State while a

minor party only needed to collect signatures on petitions equal to 3% of the total number of

registered electors in Florida. *Id*. at 132-33.  The Florida Supreme Court struck the higher

signature requirement for independent candidates unconstitutional and lowered it down to the

number imposed on a "minority party" to gain access to the general election ballot because

classifying independent candidates differently from third party candidates was not "reasonable"

nor "a valid basis for the difference in this requirement to be placed on the ballot" and that the

"arbitrary distinction cannot stand"  under the requirements of "equal protection and due process

of law." *Id*. a 133.  In *Delaney v. Bartlett*, 370 F.Supp. 2d 373 (2004), the United States District

Court for the Middle District of North Carolina employing the test announced in *Anderson v.

Celebrezze*, held higher signature requirements imposed on independent candidates than those

imposed on minor political party candidates unconstitutional explaining that:

> North Carolina's restrictions implicate important voting, associational, and
> expressive rights protected by the First and Fourteenth Amendments. 'Bu limiting
> the opportunities of independent-minded voters to associate in the electoral arena
> to enhance their political effectiveness as a group, [ballot access] restrictions
> threaten to reduce diversity and competition in the marketplace of ideas."
> *Anderson*, 460 U.S. at 794.  Unaffiliated candidates enhance the political process
> by challenging the *status quo* and providing a voice for voters who feel
> unrepresented by the prevailing political parties.  North Carolina's restrictions
> limit the opportunities for unaffiliated candidates to impact the State's political
> landscape.  This is evidenced by the degree of exclusion from the ballot of
> unaffiliated candidates in comparison with party candidates.  *See Storer v. Brown*,
> 415 U.S. 724, 742 (1974) (noting that in determining the overall burden of a
> ballot access requirement, "[p]ast experience will be helpful, if not always an
> unerring, guide: It will be one thing if independent candidates have qualified with
> some regularity and quite a different matter if they have not.")….

*Delaney*, 370 F.Supp. 2d at 377-78.  The district court, applying strict scrutiny analysis found

that the higher signature requirement imposed on unaffiliated candidates was not justified by the

State's interest against eliminating ballot clutter, voter confusion or in the dissemination of a

candidate's beliefs and held that the higher signature requirement imposed on independent

candidates as opposed to minor party candidates "neither achieves nor advances any of the

Board's stated interests.  Therefore, the more restrictive [signature] requirements cannot

withstand strict scrutiny.  *Id*. at 379-80.

The *Delaney* court, in striking down higher petition signature requirements for

independent candidates also cited to *Childrey v. Bennett*, 997 F.2d 830, 832 (11th Cir. 1993)

(noting that "the State conceded that such disparity of treatment between independent and minor

party candidates was unconstitutional" in case where Alabama required an independent

candidate's ballot petition to contain 26,000 signatures and a minor party candidate's petition to

contain 12,158 signatures).  Similarly, in 2016, in *Dorsey v. Lamone*, 1:15-cv-2170, challenging

higher signature requirements imposed on independent candidates versus minor party candidates

after the United States District Court for Maryland denied Maryland's motion to dismiss on June

10, 2016 (Docket #13) stating that the plaintiff had a strong case Maryland entered into a consent

decree lowering the signature total for independent candidates from 40,000 to the 10,000

required for minor party candidates to gain access to the general election ballot.

Accordingly, Defendant's motion to dismiss Count II of Plaintiff's Second Amended

Complaint is without merit and must be denied.

### D.     County-Based Signature Distribution Requirements to Establish a New Political Party Are Unconstitutional as a Matter of Settled Law

More than 45 years ago, the Supreme Court, applying strict scrutiny analysis, struck

down the state of Illinois' county-based signature distribution requirements on the ground that

they violate the "one man, one vote" principle as applied to ballot access regulations, and thus

deny voters in more populace counties the equal protection of law guaranteed by the Fourteenth

Amendment. *See Moore v. Ogilvie*, 394 U.S. 814, 818-19 (1969)  As applied to Plaintiff as a non-Arizona resident seeking to extend his political party into the State of Arizona, Arizona's county distribution requirement denies Plaintiff rights guaranteed to him under the Due Process Clause of the Fourteenth Amendment as a violation of Plaintiff's fundamental liberty interests under the First Amendment to the United States Constitution to freely associate with likeminded voters within Arizona to form a new political party.  *See e.g., United States v. Carolene Products Co.*, 304 U.S. 144, 153-54 at footnote 4 (1938); *Bolling v. Sharpe*, 347 U.S. 497 (1954).  Since then, no fewer than 14 federal courts have relied on *Moore* to invalidate other states' county-based distribution requirements.  *Socialist Workers Party v. Hare*, 304 F.Supp. 534 (E.D. Mich. 1969) (Striking down Michigan's law requiring that a new political party submit nomination petitions with signatures equal to at least 1 percent of the votes cast for the last successful candidate for secretary of state, and that "the petitions shall be signed by at least 100 residents in each of at least 10 counties of the state and not more than 35% of the minimum required number of the signatures may be by resident electors of any one county" noting that the rights protected under *Moore* were those of "voters to equality in the exercise of their political rights"); *Socialist Workers Party v. Rockefeller*, 314 F.Supp. 984, 986, 991 (S.D. N.Y. 1970) (striking county-based signature distribution requirement because it was "constitutionally indistinguishable from the Illinois statute" struck down in *Moore* and explaining that the problem was the statute's use of a "rigid, arbitrary formula, which was applied "to sparsely settle counties and populous counties alike."); *Sweetenham v. Rhodes*, 318 F.Supp. 1262, 1271 (S.D. Ohio 1970) (striking down as unconstitutional a county-based signature distribution requirement because it "results in a marked dilution of the voting strength of urban voters as opposed to rural voters, violating the principle of one man, one vote."); *Baird v. Davoren*, 346 F.Supp. 515, 517-18 (D. Mass. 1972)

(striking down as unconstitutional a county-based signature distribution requirement that new political parties submit a nomination petition containing signatures equal in number to the entire vote cast for governor in the previous election, and that "no more than one third of the signatures shall be from any one county" explaining that such a distribution requirement "has the effect of discriminating between voters in the populous and sparsely settled counties of the state and limits the rights of voters from the most populous counties); *Communist Party of Illinois v. State Bd. of Elections*, 518 F.2d 517, 518, 521 (7th Cir. 1975) (striking down a county-based signature distribution where of the 25,000 signatures required to be collected "not more than 13,000 of which may be counted from any one county" forcing signatures to be collected from at least 2 counties which the 7th Circuit concluded was "like the fifty county requirement in *Moore* and discriminated "against the residents of the populous counties of the state in favor of rural sections.");, *McCarthy v. Garrahy*, 460 F.Supp. 1042, 1043, 1046-50 (D. R.I. 1978)(striking down a county-based signature distribution requirement noting that the relatively minor burden imposed by the statute was "irrelevant" and what mattered more was that the law "dilutes the value of the votes of those living in more populous counties in favor of those living in less populous counties" and applying strict scrutiny analysis, the "statute can be upheld only by a showing that it promotes a compelling state interest" which the court said could not be demonstrated in enjoining the law); *Elliott v. Shapp*, No. 76-cv-1277 (E.D. Pa. 1979) (unreported decision striking down county-based signature distribution requirement on major party candidates for federal office who sought access to the primary election ballot);.  More recent court decisions have invalidated county-based signature distribution requirements under the more flexible ballot access analysis articulated by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).  *See e.g., Blomquist v. Thompson*, 739 F.2d 525, 526 (10th Cir. 1984)

PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 28

(applying *Anderson* analysis to strike down Wyoming's county-based distribution requirement); *Libertarian Party of Nebraska v. Beerman*, 598 F.Supp. 57, 61 (D. Neb. 1984) (applying *Anderson* analysis to strike down Nebraska's county-based distribution requirement).  Even more recently, several courts have relied on this same line of precedent to invalidate county-based distribution requirements for ballot initiatives.  *See, e.g., ACLU of Nevada v. Lomax*, 471 F.3d 1010 (9th Cir. 2006); *Idaho Coalition United for Bears v. Cenarrusa*, 342 F.3d 1073 (9th Cir. 2003); *Montana Pubic Interest Research Group v. Johnson*, 361 F.Supp. 2d 1222 (D. Mont. 2005); *Gallivan v. Walker*, 54 P.3d 1069 (Utah Supreme Ct. 2002).

Based on this line of precedent, it is a matter of settled law that Arizona's county-based signature distribution requirement to form a new political party which, in turn, guarantees ballot access in Arizona's 2020 presidential general election is unconstitutional and Defendant's motion for summary judgment must be denied.  In fact, the *Moore* line of precedent is particularly suited to be applied to a state such as Arizona where there are, for the most part two densely populated counties with the remaining counties largely less populated.  Defendants' argument that the Arizona some interest in making sure a new political party is supported in the rural parts of Arizona and, at minimum, beyond to boundaries of just one or two of Arizona's most populous counties is not recognized as a greater interest in the face of Fourteenth Amendment protections and cannot evade strict scrutiny analysis.  At bottom, under strict scrutiny analysis, the county-based signature distribution requirement is simply not narrowly tailored to advance a compelling governmental interest.  To the extent that Arizona has an interest in requiring a wider geographical distribution of signatures to form a new political party, a more narrow advancement of that interest would be to impose a signature distribution requirement based on apportioned districts, such as requiring a certain number of signatures to be

PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 29

collected from various congressional districts or state legislative districts because such districts are required, under Supreme Court precedent, to be apportioned into equal populations, thereby negating the vote dilution problem inherent in a county-based distribution requirement consistently struck down as unconstitutional under the *Moore* line of precedent.

Accordingly, Defendant's motion for summary judgment as to Count III of Plaintiff's Second Amended Complaint.

Respectfully Submitted,

Dated:  February 7, 2019          __**s/ Paul A. Rossi**_____
                                 Paul A. Rossi, Esq.
                                 *Counsel to Plaintiff*
                                 IMPG Advocates, Inc.
                                 316 Hill Street
                                 Mountville, PA  17554
                                 717.961.8978
                                 Paul-Rossi@comcast.net

## <u>CERTIFICATE OF SERVICE</u>

Plaintiff, by and through his undersigned legal counsel, hereby certifies that on this date a true and correct copy of the foregoing document was served via the Court's ECF system on the following opposing counsel:

Kara Karlson
Office of the Attorney General – Phoenix
*Counsel for Defendants*
1275 W Washington Street
Phoenix  AZ  85007-2997
Phone:  602-542-8118
Fax:  602-542-8308
AdminLaw@azag.gov
Kara.Karlson@azag.gov

Joseph Eugene LaRue
Office of the Attorney General – Phoenix
*Counsel for Defendants*
1275 W Washington Street
Phoenix AZ  85007-2997
Phone:  602-542-1763
Fax:  602-542-8308
AdminLaw@azag.gov
Joseph.Larue@azag.gov

Dated:  February 7, 2019       **s/ Paul A. Rossi**
         Paul A. Rossi, Esq.
         *Counsel to Plaintiff*
         IMPG Advocates, Inc.
         316 Hill Street
         Mountville, PA  17554
         717.961.8978
         Paul-Rossi@comcast.net