**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Roque De La Fuente,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>State of Arizona, et al.,<br><br>　　　　　Defendants. | No. CV-16-02419-PHX-JZB<br><br>**ORDER** |

Pending before the Court are Cross Motions for Summary Judgment (docs. 55, 58), Defendant's *Daubert* Motion (doc. 78), and Defendant's Motion to Strike (doc. 85). The Court will grant Defendant's Motion for Summary Judgment (doc. 55) and deny all others (docs. 58, 78, 85).

**I.     Summary.**

In this action, Plaintiff challenges the constitutionality of two Arizona statutes (A.R.S. §§ 16-341, 16-801), which limit access of independent candidates for President of the United States to the State's general election ballot. The Court finds that Plaintiff fails to show that the statutes impose a "severe" burden under the *Anderson/Burdick* framework established by the Supreme Court, and thus applies the Ninth Circuit's "sliding scale" balancing test to evaluate the constitutionality of the challenged statutes. Ultimately, the Court finds that Arizona's stated interests are sufficient to justify the burden imposed on candidates. Accordingly, the Court will grant summary judgment in favor of Defendant Hobbs, and against Plaintiff.

## II. Background.

On July 20, 2016, Plaintiff initiated this action by filing his Complaint. (Doc. 1.) Plaintiff subsequently amended his Complaint twice. (Docs. 12, 53.)

In his Second Amended Complaint (SAC), Plaintiff challenges the constitutionality of A.R.S. § 16-341 and § 16-801 on three collective grounds: (1) "the signature collection requirement of Section 16-341 of the Arizona Revised Statutes, as applied to Plaintiff and all independent presidential candidates, violates rights guaranteed under the First Amendment to the United States Constitution" (doc. 54 at 5-6); (2) "the signature collection requirement of Section 16-341 of the Arizona Revised Statutes, as applied to Plaintiff and all independent presidential candidates, violates rights guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution" (*id.* at 6-7); (3) "the signature distribution requirement of Section 16-801 of the Arizona Revised Statutes, as applied to Plaintiff, violates rights guaranteed under the Due Process Clause of the Fourteenth Amendment to the United States Constitution" (*id.* at 7-8).

A.R.S. § 16-341 requires that independent candidates for statewide office obtain signatures totaling at least three percent of the number of registered independent voters in the State.[1] For the 2016 election, an independent candidate was required to obtain approximately 35,514 signatures to be placed on the state's general ballot. (Doc. 56, ¶ 4.) For the 2020 election, based on current available information, that number will increase to approximately 37,141 valid signatures required. (*Id.*, ¶ 6.)

A.R.S. § 16-801 provides that:

> A new political party may become eligible for recognition and shall be represented by an official party ballot at the next ensuing regular primary election and accorded a column on the official ballot at the succeeding general election on filing with the secretary of state a petition signed by a

---

[1] In full, A.R.S. § 16-341(E) states:
> The nomination petition shall conform as nearly as possible to the provisions relating to nomination petitions of candidates to be voted for at primary elections and shall be signed by at least the number of persons who are registered to vote determined by calculating three percent of the persons who are registered to vote of the state, county, subdivision or district for which the candidate is nominated who are not members of a political party that is qualified to be represented by an official party ballot at the next ensuing primary election and accorded representation on the general election ballot.

number of qualified electors equal to not less than one and one-third per cent of the total votes cast for governor at the last preceding general election at which a governor was elected. From this number, at least five different counties shall be included as the county of registration among the required total of qualified electors and at least ten per cent of the required total of qualified electors shall be registered in counties with populations of less than five hundred thousand persons.

A.R.S. § 16-801(A). In 2020, the required number of signatures to form an independent political party is expected to be 31,603. (Doc. 56, ¶ 11)

Plaintiff, in his pleadings and papers, alleges the following facts with respect to his participation in the 2016 presidential campaign and his plans for the 2020 campaign:

- Plaintiff campaigned for the Democratic Party's nomination for President from September 2015 until the Democratic Party's 2016 National Nominating Convention (DNC) in July 2016 (*id.*, ¶¶ 14, 15);
- Plaintiff spent approximately 10 to 14 days in Arizona actively campaigning for the Democratic nomination for President, and was a candidate on the 2016 Arizona primary ballot for that nomination (*id.*, ¶¶ 16-17);
- Plaintiff did not win any state's primary election or caucus in 2016, and did not receive the Democratic Party's nomination for President (*id.*, ¶¶ 18-19);
- After the DNC ended, approximately three months before the general election, Plaintiff decided to run as an independent candidate for President (*id.*, ¶ 20);
- Plaintiff spent one week trying to gather the 35,514 valid signatures necessary to qualify for the Arizona ballot as an independent candidate for President (*id.*, ¶ 23);
- Plaintiff relied entirely on hired signature gatherers to collect signatures in Arizona, and collected between 4,000 and 9,000 signatures (*id.*, ¶ 24-25);
- Plaintiff's signature gatherer, Marci Burton, estimated a validity rate of 20% among signatures collected (*id.*, ¶ 26);
- Based on this rate, Plaintiff estimated he would need to collect 150,000 signatures in order to meet Arizona's requirement for valid signatures to be placed on the ballot as an independent candidate for president (*id.*, ¶ 27);
- Plaintiff subsequently decided to cancel his signature gathering efforts in Arizona

- (*id.*, ¶ 29);
- Plaintiff qualified as a write-in candidate for President, representing the American Delta Party, and received 29 total votes (*id.*, ¶ 30);
- In 2016, Plaintiff did not attempt to gather signatures in Arizona, or take any other steps, to attempt to qualify the American Delta Party or any other new political party for ballot access (*id.*, ¶ 31);
- Plaintiff has officially declared his intention to run for President in 2020, but was initially unclear as to whether he will be campaigning as an independent candidate, or seeking a party's nomination (*id.*, ¶ 33). Plaintiff has since made clear that he will be running for President in 2020 as either an independent or third-party candidate. (Doc. 61, ¶¶ 5-6.)

On November 29, 2018, the parties filed cross motions for summary judgment. (Docs. 55 (Defendant's Motion for Summary Judgment ("DMSJ")), 58 (Plaintiff's Motion for Summary Judgment ("PMSJ")).) Both Motions have been fully briefed.[2] On February 4, 2019, Defendant filed a Motion *in limine* to Exclude the Expert Testimony of Richard Winger. (doc. 78), and the Motion is fully briefed (docs. 84, 88). On February 21, 2019, Defendant filed a Motion to Strike Plaintiff's Reply in support of his MSJ (doc. 83) and the "Second Richard Winger Declaration" (doc. 83-1), which was filed as an attachment to that Reply. (Doc. 85.) Plaintiff has filed a response (doc. 86), and Defendant has replied (doc. 87). The Court will address each Motion below.

**III. Standing.**

As a threshold matter, the Court must first determine whether Plaintiff De La Fuente has standing to bring his challenges in this Court. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. The doctrine developed in our case

---

[2] Doc. 56 (Defendant's Statement of Facts ("SOF")); Doc. 57 (Declaration of Andrew Pappas); Doc. 59 (PSOF); Doc. 60 (Declaration of Richard Winger); Docs. 61-66 ("Additional Attachments to Main Document" re: PMSJ); Doc. 67 (Declaration of Eric Spencer); Doc. 74 (Defendant's Response to PMSJ); Doc. 75 (Defendant's Contravening Statement of Facts ("CSOF")); Doc. 77 (Declaration of Joseph E. La Rue); Doc. 79 (Plaintiff's Response to DMSJ); Doc. 80 (Plaintiff's CSOF); Doc. 81 (Defendant's Reply re: DMSJ); Doc. 82 (Declaration of Joseph E. La Rue re: Defendant's Reply); Doc. 83 (Plaintiff's Reply re: PMSJ).

law to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). It is well "established that the 'irreducible constitutional minimum' of standing consists of three elements[:]" Plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* Plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. *Id.* (citing *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231 (1990)).

Defendant argues that Plaintiff fails to establish standing in this case because "the injuries he asserts are speculative and contingent by definition." (Doc. 55 at 7.) The Court disagrees. "[T]he injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). Here, Plaintiff has made clear that he intends to run as an independent or third-party candidate in the 2020 election, and thus Plaintiff is directly threatened by the allegedly unconstitutional signature requirements in the challenged statutes. Plaintiff's prospective injury is directly traceable to the challenged statutes, and it would clearly be redressed by a favorable judicial decision.

Accordingly, the Court finds that Plaintiff has standing to bring his challenges to A.R.S. § 16-341 and A.R.S. § 16-801.

**IV.     Defendant's Motion for Summary Judgment.**

    **a.     Legal Standard.**

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**b.     Discussion.**

Plaintiff has alleged that two Arizona statutes governing access to the state's general election ballot, A.R.S. § 16-341 and A.R.S. § 16-801, are unconstitutional. First, Plaintiff argues that A.R.S. § 16-341 is unconstitutional as applied to independent candidates because it imposes a severe burden on ballot access for those candidates in violation of the First Amendment, and it violates those candidates Equal Protection Rights under Fourteenth Amendment. (Doc. 54 at 4-7.) Second, Plaintiff asserts that A.R.S. § 16-801 is unconstitutional as applied to Plaintiff because it violates rights guaranteed to him under the Due Process Clause of the Fourteenth Amendment. (*Id.* at 7-8.) The Court will begin by addressing Plaintiff's First Amendment challenge to A.R.S. § 16-341.

**c.     Constitutional Analysis.**

"There is an inevitable tension between a state's authority and need to regulate its elections and the First and Fourteenth Amendment rights of voters, candidates and political parties." *Ariz. Libertarian Party v. Hobbs*, --- F.3d ---, 2019 WL 2307116 (9th Cir. May 31, 2019). To harmonize these competing demands, the Supreme Court has provided a flexible framework for courts to use when reviewing constitutional challenges to state election regulations. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). In *Anderson*, the Court provided that:

> [A] court must . . . first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it must also consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a

position to decide whether the challenged provision is unconstitutional. *Anderson*, 460 U.S. at 789.

In *Burdick*, the Court expanded on *Anderson*, stating:

> Under [the *Anderson*] standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance. But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.

*Burdick*, 504 U.S. at 434.

The Ninth Circuit has summarized the *Anderson/Burdick* approach as a "'balancing and means-end fit framework.'" *Ariz. Green Party v. Reagan,* 838 F.3d 983, 988 (9th Cir. 2016) (quoting *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016) (en banc)). Specifically, "[t]his is a sliding scale test, where the more severe the burden, the more compelling the state's interest must be[.]" *Id.*

If an election regulation imposes a "severe burden" on voting rights, "the state must show the law is narrowly tailored to achieve a compelling governmental interest—strict scrutiny review." *De La Fuente v. State*, 278 F. Supp. 3d 1146, 1150-51 (C.D. Cal. 2017) (citing *Chamness v. Bowen,* 722 F.3d 1110, 1116 (9th Cir. 2013) (affirming district court's grant of summary judgment in favor of California's Secretary of State where plaintiffs were challenging legislation that changed "the California election system by eliminating party primaries and general elections with party-nominated candidates, and substituting a nonpartisan primary and a two-candidate runoff"); *accord Dudum v. Arntz*, 640 F.3d 1098, 1106 (9th Cir. 2011) (affirming district court's grant of summary judgment in favor of San Francisco Director of Elections where plaintiffs were challenging city's implementation of "instant runoff voting . . . to replace [a] two-round runoff")).

"Where non-severe, '[l]esser burdens' on voting are at stake, we apply 'less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'" *Dudum*, 640 F.3d at 1106 (quoting *Timmons*

*v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *accord Chamness*, 722 F.3d at 1116 ("Nondiscriminatory restrictions that impose a lesser burden on speech rights need only be reasonably related to achieving the state's important regulatory interests.") (internal quotation marks and citations omitted). "[V]oting regulations are rarely subjected to strict scrutiny." *Dudum*, 640 F.3d at 1106.

The Court will now consider each of Plaintiff's constitutional challenges under the *Anderson/Burdick* balancing framework.

### d. Supreme Court Cases Addressing Statutory Burden on Plaintiff.

In *Jenness v. Fortson*, 403 U.S. 431 (1971), the Supreme Court addressed a Georgia law that permitted a candidate who failed to enter or win his party's primary election to have his name placed on the general election ballot if he obtained signatures from 5% of the voters eligible to vote in the last general election. *Id.* at 432. The Court found that the 5% requirement, although higher than most states, was "balanced by the fact that Georgia [had] imposed no arbitrary restrictions whatever upon the eligibility of any registered voter to sign as many nominating petitions as he wishes." *Id.* at 442. The Court upheld the 5% requirement. *Id.*

In *Storer*, the Supreme Court examined a California law that required independent candidates who wished to appear on the general election ballot to obtain signatures of between 5% and 6% of the entire vote cast in the preceding general election in the area where the candidate sought office. 415 U.S. at 726-27. The candidate's petition could not, however, be signed by voters who had voted in the preceding primary election (*id.* at 739), and all signatures had to be obtained during a 24-day period following the primary (*id.* at 727). Because the pool of qualified signers was reduced by excluding primary election voters—a reduction which would have the effect of requiring a candidate to obtain signatures from more than 5% or 6% of the available signers—the Supreme Court remanded the case to determine the precise extent of the burden. *Id.* at 740, 746.

In *American Party of Texas v. White*, 415 U.S. 767 (1974), the Supreme Court considered a series of Texas laws that provided four methods for placing candidates on the

general election ballot. *Id.* at 772. Minor political parties were allowed to nominate candidates through party conventions. *Id.* at 777. But to have these nominees appear on the general ballot, the parties were required to demonstrate support in the form of convention participants numbering at least 1% of the total votes cast for governor at the last general election. *Id.* If the required number of individuals did not participate in the nominating convention, the party could secure its candidate's position on the general ballot by circulating petitions for signature. *Id.* The party was required to obtain signatures from persons equaling 1% of the total votes in the last gubernatorial election, but a voter who had already participated in any other party's primary election or nominating process was ineligible to participate in a second nominating convention or sign a petition. *Id.* at 778. Additionally each signer had to give a notarized oath that she had not participated in any other party's nominating or qualification proceeding. *Id.* The Court upheld this scheme, finding, as a whole, that it "afford[ed] minority political parties a real and essentially equal opportunity for ballot qualification." *Id.* at 788.

In *Munro v. Socialist Workers Party*, 479 U.S. 189 (1986), the Supreme Court addressed the validity of a Washington law which required that a minority-party candidate for an office receive at least 1% of all votes cast for that office in the State's blanket primary election before she would be included on the general election ballot. *Id.* at 190. Because Washington used a blanket primary, registered voters could vote for any candidate regardless of the candidate's party affiliation. *Id.* at 192. The Court noted that "States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office." *Id.* at 194. Emphasizing that there is no "litmus-paper test" for deciding when a ballot restriction violates First and Fourteenth Amendment rights, the Court held that the Washington requirement was valid. *Id.* at 195, 199

  **e. A.R.S. § 16-341 – First Amendment Claim.**

    **1. Burden.**

Here, Plaintiff argues that A.R.S. § 16-341 imposes a "severe burden" and thus

should be subject to strict scrutiny. (Doc. 58 at 17-20.)

> The crux of Plaintiff's argument is that the 35,000+ signature requirement imposed by A.R.S. §16-341 is excessive and unduly infringe upon the constitutional right of Plaintiff to participate in Arizona's presidential electoral process and the rights of voters to associate with Plaintiff for the advancement of their political beliefs and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.

(*Id.* at 17.)

The burden of an election regulation is considered "severe," and thus warrants strict scrutiny, where the regulation "significantly impairs access to the ballot, stifles core political speech, or dictates electoral outcomes." *Chamness,* 722 F.3d at 1116. An election regulation will not be deemed "severe," and will thus be subject to less searching scrutiny, where the restriction imposed is "generally applicable, evenhanded, and politically neutral, or if it protects the reliability and integrity of the election process." *Id.* at 1117; *accord Dudum,* 640 F.3d at 1106. The Ninth Circuit has stated that the relevant inquiry is whether "[the state's] ballot access requirements seriously restrict the availability of political opportunity." *Ariz. Green Party*, 838 F.3d at 989. A plaintiff bears the initial burden of establishing that he or she has been subjected to a severe burden. *Arizona Libertarian Party v. Reagan*, 798 F.3d 723, 730 (9th Cir. 2015).

Here, Plaintiff presents two arguments supporting his assertion that A.R.S. § 16-341 imposes a severe burden. Plaintiff first argues that the electoral history in Arizona shows that A.R.S § 16-341 has prevented almost all independent candidates from obtaining general election ballot access. (Doc. 58 at 18.) Specifically, Plaintiff states that "with one exception (Ralph Nader in 2008), the voters of Arizona have not had the opportunity to case their ballots for an independent presidential candidate" under the current law. (*Id.*)

To the extent Plaintiff is arguing that the low number of independent presidential candidates who have appeared on the ballot in Arizona since 1993, when A.R.S. § 16-341 was enacted, stands as evidence that the statute is a severe burden to independent candidate access, Plaintiff's point is misleading and not persuasive. To date, § 16-341 has not prevented all independent candidates from appearing on the state's general election ballot

for president. The first presidential election for which § 16-341 was in effect was 1996. *See* Doc. 60 ¶ 8 (citing Ariz. Laws 1993, Ch. 98, § 26-4, eff. Jan. 1, 1994). That year, approximately 9,433 signatures were required for an independent presidential candidate to gain general-election ballot access, but none did. (Doc. 75, ¶¶ 17-18.) In 2000, roughly 8,900 signatures were required, and in 2004, approximately 15,899 signatures were required – yet no independent presidential candidates gained ballot access in those years, either. (*Id.*, ¶¶ 13-16.) But in 2008, when Ralph Nader qualified for the ballot as an independent candidate, approximately 21,758 signatures were required. (*Id.*, ¶¶ 11-12.) That Nader gained ballot access in 2008 even though the signature requirement was higher that year than in any of the three previous election cycles suggests that Arizona's signature requirement does not prevent a candidate who enjoys a modicum of support from achieving ballot access.

Plaintiff also argues that "the voters of Arizona have lacked the political choices available to citizens in other states." (Doc. 58 at 18.) But Plaintiff's position is again misleading. In each of the presidential elections since A.R.S. § 16-341 was enacted, Arizona voters have had a number of choices besides the major-party candidates for president. Specifically, in 2016 and 2012, Libertarian and Green party candidates for president appeared on the ballot in Arizona; in 2008, Libertarian, Green, and Independent candidates did; in 2004, a Libertarian did; in 2000, the Green, Libertarian, Natural Law, and Reform parties all had candidates on the Arizona ballot; and in 1996, the Libertarian and Reform parties did. (Doc. 75, ¶¶ 25-29.)

To the extent Plaintiff insists that the Court must fixate on number of *independent candidates*, versus third party and minor party candidates, when evaluating whether A.R.S. § 16-341 imposes a severe burden (*see* doc. 58 at 17-20), Plaintiff's position is contrary to governing law. The Ninth Circuit explicitly provides that courts "must examine the entire scheme regulating ballot access[,]" rather than fixating on the ability of a single grouping, like independent candidates, to secure placement on the ballot. *See De La Fuente*, 278 F. Supp. 3d at 1154 (quoting *Ariz. Libertarian Party*, 798 F.3d at 790). Furthermore, as

Plaintiff's own expert explained in his California litigation, the presence of these minor-party candidates on the ballot helps explain the absence of independent candidates. *Id.* (quoting Winger's deposition testimony that "[b]ecause California has these minor parties [o]n the ballot, that kind of – there's almost nobody left to petition.").

Even if the Court focuses only on Arizona voters opportunity to choose independent candidates, the Court finds that Arizona voters' choices have been roughly the same as the remainder of the Country.

> In 2016, Arizona was one of 35 States plus the District of Columbia that had no independent candidates for president on its general election ballot; in 2012, it was one of 41 such jurisdictions; in 2004, it was one of 29; in 2000, it was one of 32; and in 1996, it was one of 35.

(Doc. 74 at 10 (citing doc. 75, ¶¶ 19-20, 22-24).) In 2008, Arizona was one of 43 States to have one or zero independent candidates on its ballot. (Doc. 75, ¶ 21.) Arizona's voters have been provided with the same number of independent candidate choices as the majority of the country in each presidential election since A.R.S. § 16-341 was enacted.

The Court finds that Plaintiff has failed to provide sufficient evidence to show that Arizona's ballot-access requirements impose an unreasonable or severe burden on either him individually or independent candidates, as a whole. In 2016, an independent presidential candidate in Arizona had to obtain 35,514 signatures to qualify for the general ballot. (Doc. 75 at 10, ¶15.) A.R.S. § 16-341 imposed no other requirements or restrictions on ballot access.

Plaintiff asserts he was "reasonably diligent" in his 2016 efforts to gain ballot access in Arizona because he attempted to collect signatures for one week, just months before the election, during which he obtained "over 9,000 valid signatures." (Doc. 58 at 18; Doc. 55 at 10.) The Court disagrees. Plaintiff had no volunteers canvasing for his campaign, and instead relied on paid signature gatherers. (Doc. 55 at 11.) Plaintiff waited until just mere months before the general election to launch his independent campaign, and thus failed to start his signature gathering efforts in a reasonably timely manner. Unlike other states, which impose strict time periods for signature collection that have been deemed

burdensome, Arizona law does not impose a strict time period for collecting signatures on would-be candidates. *See Storer*, 415 U.S. at 740 (requiring 1,000 canvassers to collect 14 signatures each day for 24 days likely imposes a modest burden). And Plaintiff's contention that he would have needed in excess of 150,000 signatures to satisfy the 35,514 signature requirement appears inaccurate because Arizona does not require a candidate to submit signatures well in excess of the necessary amount. "To the contrary, Arizona permits candidates to solicit and submit signatures through an easy-to-use and streamlined online portal. . . . signatures submitted through the online portal are instantaneously verified, thereby reducing the need to submit signatures above the threshold." *Ariz. Libertarian Party*, 2019 WL 2307116 at *5.

In sum, Plaintiff provides no evidence that he was actually burdened by the statute, as opposed to the fact that his candidacy just did not enjoy the modicum of support necessary to satisfy § 16-341's requirements. The Court will now turn to whether the States' important regulatory interests justify the modest burden imposed by A.R.S. §16-341.

**2. State's Regulatory Interests Justify Modest Burden of § 16-341.**

"Where non-severe, '[l]esser burdens' on voting are at stake, we apply 'less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'" *Dudum*, 640 F.3d at 1106 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *accord Chamness*, 722 F.3d at 1116 ("Nondiscriminatory restrictions that impose a lesser burden on speech rights need only be reasonably related to achieving the state's important regulatory interests.") (internal quotation marks and citations omitted).

"Arizona's asserted interests in preventing voter confusion, ballot overcrowding, and frivolous candidacies are important interests that have justified equally, if not more, burdensome general election ballot restrictions." *Ariz. Libertarian Party*, 2019 WL 2307116 at *5. Because the Court does not require "a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous

candidacies," *Munro*, 479 U.S. at 194-95, nor proof that ballot rules are "the only or the best way to further the proffered interests," *Dudum*, 640 F.3d at 1114, Arizona has easily met its burden. The signature requirement set forth for independent candidates to gain access to the state's general election ballot reasonably furthers Arizona's important regulatory interests and therefor justifies a modest burden on Plaintiff's right of access to the ballot.

Accordingly, the Court will grant Defendant's Motion for Summary Judgment on Count One of Plaintiff's Second Amended Complaint.

### f. A.R.S. § 16-341 – Equal Protection Claim.

In Count Two of Plaintiff's Second Amended Complaint, Plaintiff asserts that "the signature collection requirement of Section 16-341 of the Arizona Revised Statutes, as applied to Plaintiff and all independent presidential candidates violates rights guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution." (Doc. 54, ¶¶ 21-25.) "To sustain his challenge on equal protection grounds, [Plaintiff] must establish that the two groups," independent candidates and new political parties, "are similarly situated with respect to the routes they must take to get on the general election ballot." *Van Susteren v. Jones*, 331 F.3d 1024, 1027 (9th Cir. 2003.)

Plaintiff makes no showing that the two groups are similarly situated and his Equal Protection Clause claims fail on that point alone. Courts have frequently recognized that the two groups and their approach to political activity is distinct. *See Storer*, 415 U.S. at 745 ("The political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other."); *Arutunoff v. Okla. State Election Bd.*, 687 F.2d 1375, 1380 (10th Cir. 1982) (rejecting an equal-protection claim based on distinct requirements for independent candidates and minor parties seeking ballot recognition, stating that "[a] political group becoming a recognized political party and offering to the electorate a slate of candidates is far different than one individual becoming an independent candidate to run for a particular office."). One court distinguished political parties and independent candidates based on the fact that "political

parties, whether they be major, medium, or minor, are subject to additional regulation not imposed upon independent candidates seeking ballot access." *Nader v. Connor*, 332 F. Supp. 2d 982, 990 (W.D. Tex. 2004). Because Plaintiff does not establish the two groups are similarly situated, Plaintiff's equal protection claims must fail.

Even if the Court were to assume, arguendo, that political parties and independent candidates were similarly situated, Plaintiff's equal protection claims would still fail, because the two processes Arizona provides to gain access to the general election ballot for independent candidates (A.R.S. § 16-341) and political parties (A.R.S. § 16-801) are distinct from one another, and neither is more burdensome. *See Erum v. Cayetano*, 881 F.2d 689, 695 (9th Cir. 1989) (rejecting an equal-protection challenge to Hawaii's disparate requirements for new party and independent candidates) *overruled on other grounds as recognized in Lightfoot v. Eu*, 964 F.2d 865, 868 (9th Cir. 1992); *see also Nader v. Cronin*, 620 F.3d 1214, 1218 (9th Cir. 2010) (same).

Under Arizona law, a new political party can gain general-election ballot access by obtaining a number of signatures equal to at least 1 1/3% of the total votes cast for governor in the most recent gubernatorial election. A.R.S. § 16-801(A). Based on unofficial totals from 2018, a new party seeking to obtain ballot access in 2020 will need to obtain approximately 31,603 signatures. (Doc. 55 at 14.) Estimates are that an independent candidate will need 37,141 signatures to obtain general election ballot access in Arizona for that same 2020 election. (*Id.*) But merely analyzing the number of signatures required is insufficient to determine if one method is easier than the other. Under § 16-801, for example, a political party has a much earlier deadline to submit signatures than an independent candidate seeking ballot access under § 16-341. A political party seeking access under § 16-801 must also obtain signatures from at least five different Arizona counties, at least 10% of the political party's signatures must come from voters in counties with a population fewer than 500,000. But an independent candidate may obtain all required signatures in a single county.

No evidence before the Court suggests that one process is clearly more burdensome

than the other. Because the signature requirements of one statute is not inherently more burdensome than those of the other, the differences between the statutes "do not run afoul of the equal protection clause." *Erum*, 881 F.2d at 695. Accordingly, the Court will grant Defendant's Motion for Summary Judgment against Count Two of Plaintiff's Second Amended Complaint.

### g. A.R.S. § 16-801 – Fourteenth Amendment Due Process Claim.

In Count Three of Plaintiff's Second Amended Complaint, Plaintiff asserts that "the signature distribution requirement of Section 16-801 of the Arizona Revised Statutes, as applied to Plaintiff, violates rights guaranteed under the Due Process Clause of the Fourteenth Amendment to the United States Constitution." (Doc. 54 at 7-10, ¶¶ 26-28, 27-29, 25[3].) As noted above, A.R.S. § 16-801 sets forth the signature distribution requirements for a new party seeking ballot recognition. Specifically, § 16-801 requires a new party to file a petition signed by "a number of qualified electors" equal to 1 1/3 percent of the total number of cast for governor in the last election. A.R.S. § 16-801(A). The signed petition must include signatures from at least five different counties, and at least ten percent of the required number of qualified electors must be registered in counties with populations of less than 500,000 persons. *Id.*

Plaintiff alleges that the distribution requirements set forth in § 16-801 "grants individual voters registered in counties with less than 500,000 persons more clout and essentially veto authority over the formation of new political parties in Arizona against voters located in more populated counties in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution." (Doc. 54 at 7, ¶ 27.) Plaintiff's argument is baseless.

To be sure, federal courts "have invalidated geographic distribution requirements that allocate equal political power to geographical units having unequal population." *Angle v. Miller*, 673 F.3d 1122, 1128 (9th Cir. 2012). For example, the Supreme Court "invalidated an Illinois law requiring presidential candidates seeking a place on the ballot

---

[3] The Court notes that the paragraph numbering in Plaintiff's Second Amended Complaint under Count Three is as follows: 26, 27, 28, 27, 28, 29, 25. (*See* Doc. 54 at 7-8.)

to obtain 200 petition signatures from each of at least 50 of the state's 102 counties." *Angle*, 673 F.3d at 1128 (citing *Moore v. Ogilvie*, 394 U.S. 814 (1969)). Under this law, the Court explained, "the electorate in 49 of the counties which contain 93.4% of the registered voters may not form a new political party and place its candidates on the ballot," while "25,000 of the remaining 6.6% of registered voters properly distributed among the 53 remaining counties may form a new party to elect candidates to office." *Moore*, 394 U.S. at 819. The law thus "applie[d] a rigid, arbitrary formula to sparsely settled counties and populous counties alike," "discriminat[ing] against the residents of the populous counties of the State in favor of rural sections." *Id.* at 818-19.

Applying *Moore*, the Ninth Circuit "invalidated an Idaho law requiring initiative proponents to obtain signatures from 6 percent of qualified voters in each of at least half of Idaho's 44 counties," as well as a Nevada law that "required initiative proponents to gather signatures of a number of registered voters equal to 10 percent or more of the number of voters who voted at the last preceding general election in 13 of Nevada's 17 counties." *Angle*, 673 F.3d at 1128 (discussing *Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d 1073, 1076 (9th Cir. 2003), and *ACLU of Nev. v. Lomax*, 471 F.3d 1010 (9th Cir. 2006)). In *Lomax*, the court held that "an initiative qualification rule that requires a fixed percentage of petition signatures from a fixed percentage of counties in a state with a substantially uneven geographic distribution pattern, which favors residents of sparsely populated areas over residents of densely populated areas, violates the Equal Protection Clause." *Lomax*, 471 F.3d at 1020. The rule there "dilute[d] the power of some votes by providing more sparsely populated counties with the same total power as densely populated counties," because 10 percent of the total required signatures had to be collected in each county, regardless of whether that county claimed 50 percent, or 5 percent, or any other percentage of Nevada's total population.

Here, A.R.S. § 16-801 is distinct from those laws because § 16-801 does not impose the same kind of "rigid, arbitrary formula" that is inherently suspect. *Moore*, 394 U.S. at 818. Nor does it overvalue the votes of rural Arizonans to the detriment of voters in more

populous counties. Unlike the problematic laws in *Moore*, *Cenarrusa*, or *Lomax*, § 16-801 does not require new parties to collect a fixed number or percentage of signatures in each county. Instead, it requires only that 10% of the overall signature total be collected from signatories registered in counties with populations 500,000 or less. Arizona has 13 counties with 500,000 or fewer residents, and those counties account for 24.7% of all Arizona residents and 24.3% of all registered voters. (Doc. 56, ¶¶ 36-37.) The burden imposed by A.R.S. § 16-801 is far lighter than the burdens imposed in the other cases discussed above. The Court finds that A.R.S. § 16-801 is distinguishable from those laws that have been struct down for relying on county-based signature distribution requirements, and is constitutionally permissible.

In Plaintiff's' Motion for Summary Judgment, Plaintiff argues that A.R.S. § 16-801:

> diminishes [Plaintiff's] right to freely associate, on equal terms, with the qualified voters of the larger Arizona counties and forces him to associate with qualified voters in more rural counties which challenged statute gives and effective veto power over the formation of a new political party in the State of Arizona with automatic primary and general election ballot access for a minimum of 4 years[.]

(Doc. 58 at 27.) Plaintiff's argument is misplaced. It is important to focus on the fact that A.R.S. § 16-801 deals with the formation of a political *party* (not individual), and the accompanying ballot access in all elections, including statewide and local races, that comes with that recognition. It is no surprise that A.R.S. § 16-801 does not contemplate Plaintiff's situation – that of an individual from outside the state looking to form a political party in Arizona solely to obtain ballot access for his presidential campaign. But it does not have to. Arizona has a legitimate interest in ensuring that recognized political parties in the state enjoy at least some support from the state at large.

A.R.S. § 16-801 ensures that less populous counties are not ignored, but there is no evidence that it gives them the kind of disproportionate veto power Plaintiff asserts must be eliminated. Accordingly, the Court will grant Defendant's Motion for Summary Judgment against Count Three of Plaintiff's Second Amended Complaint.

/

### V. Conclusion and Other Motions.

In sum, the Court will grant Defendant's Motion for Summary Judgment (doc. 55) on each count of Plaintiff's Second Amended Complaint. As such, the Court will deny Plaintiff's Motion for Summary Judgment (doc. 58) as moot. Also pending before the Court is Defendant's *Daubert* Motion (doc. 78) and Defendant's Motion to Strike (doc. 85). Because the Court has granted summary judgment against each of Plaintiff's claims, the Court need not decide these motions and will deny them as moot.

**IT IS ORDERED:**

1. Defendant's Motion for Summary Judgment (doc. 55) is **granted**.

2. Plaintiff's Motion for Summary Judgment (doc. 58) is **denied**.

3. Defendant's *Daubert* Motion (doc. 78) and Motion to Strike (doc. 85) are **denied as moot**.

4. The Clerk is directed to enter judgment for Defendant, and against Plaintiff, on all counts of Plaintiff's Second Amended Complaint (doc. 54), and terminate this action.

Dated this 10th day of June, 2019.

Honorable John Z. Boyle
United States Magistrate Judge